Bagley v. Castile.

---

BAGLEY V. CASTILE.

<table>
<tr><td>42</td><td>77</td></tr>
<tr><td>55</td><td>37</td></tr>
<tr><td>42</td><td>77</td></tr>
<tr><td>68</td><td>69</td></tr>
<tr><td>42</td><td>77</td></tr>
<tr><td>74</td><td>577</td></tr>
<tr><td>42</td><td>77</td></tr>
<tr><td>80</td><td>84</td></tr>
<tr><td>f82</td><td>301</td></tr>
<tr><td>42</td><td>77</td></tr>
<tr><td>f 84</td><td>593</td></tr>
</table>

1. TAXATION: *Power of the Legislature.*
    The general powers for raising revenue granted to the Legislature by the Constitution must be measured by usages obtaining and well recognized at the time of its adoption, and any disposition of property for taxes that would arbitrarily cut off from the owner all possibility of benefit from the excess of value over the taxes would be an abuse of power.

2. TAX SALES: *Act of March* 16, 1879: *Purchasers under.*
    The act of March 16, 1879, " to provide for the redemption of delinquent lands " is unconstitutional and void; but a purchaser of lands for taxes under said act, and his vendee, has a lien upon the land for the burden discharged, both in the purchase and for subsequent taxes.

APPEAL from *Pulaski* Chancery Court.
Hon. DAVID W. CARROLL, Chancellor.

Bagley v. Castile.

*Paul Bagley, pro se.*

Contends that the act is constitutional. That the law contemplated a *sale* of the lands after one year, and not a *redemption*, and that the Chancellor erred in sustaining a general demurrer to the bill, and in not granting the alternative relief prayed, citing numerous authorities.

*S. P. Hughes* for appellant.

The law contemplated a *sale*, not a redemption. The *title* of the act is not a safe criterion to judge of the intention of the Legislature. (*Sedgwick on Stat. and Const. Law,* *51; Am. Law Rev., August, 1883.*) The intention of the Legislature must always control. (*2 Cranch, 10, 258; 3 Cow., 89; 3 Scam., 153; 12 John., 176; 4 Cush., 314; 1 Miss., 147; 2 H. & J., 69, 167; 1 Peters, 64; 2 Ib., 662.*) And this intention must be collected from the whole act. *1 Kent Com., 461; 12 John., 175; 2 Cranch, 358; 2 Scam., 224: 3 Ib., 35, 153; 10 Ga., 190; Cooley Const. Lim., 184.*

The act is constitutional. The State had a right to sell for taxes, and was not obliged to first have the lands condemned or forfeited; nor need there be a public advertisement, notice and sale. (*Cooley Const. Lim., 318.*) "Law of the land" means "due process of law," and constitutional provisions securing trial by jury and due process of law *do not* apply to proceedings for the assessment and collection of public revenues, or the exercise by government of political rights. (*54 Ill., 39; Cooley on Taxation, 36 to 40, 302–3.*) But the act of 1879 is the "law of the land." *Cooley on Taxation, 38, n. 1.*

The power of taxation, and the policy and mode of enforcing it, is with the Legislature, and the courts have nothing to do with it. *Cooley Const. Lim., 479; 8 Otto, 392; Cooley on Taxation, 32 to 36; 2 Story on Const., 397.* See also *Cooley Const. Lim., 160, 169, 164 171, 177, 182–3; 2 B. Mon., 179.*

*Blackwood & Williams* for appellee.

1.   Until land is forfeited to the State, she has no power to sell. (*Blackwell on Tax Titles, ch. 82.*) The whole period prescribed by statute must elapse before a sale can take place. *Burroughs on Taxation, p. 297; 30 Me., 226; 3 G. Greene (Iowa), 133; 16 How., 610.*

If the State had a right to sell, she must sell at public sale to the highest bidder, or the sale will be depriving the citizen of his property without process of law, or the law of the land contrary to *sec. 21, art. 2, Const., 1874.*

As to what is "due process of law," and "the law of the land," see *Cooley Const. Lim. (4th ed.), 353 et seq.; 4 Wheat., 235; Ib., 519; 1 Bay., 384; Blackwell on Tax Titles, p. 17; Story on Const.; Sedgwick on Stat. and Const. Law, pp. 534, 619; Smith's Com. on Const., p. 722.*

To make a valid sale, the State must sell at public sale, to the highest bidder. *Blackwell on Tax Titles, 267; Burroughs on Taxation, p. 297; Cooley on Taxation, pp. 339 and 344.*

*J. M. Moore,* also for appellee.

The act is unconstitutional. *Cooley on Taxation, p. 339; 4 Hill, 144–5; 32 Miss., 424; 11 Minn., 480; 4 Dev. (N. C.), 15; 13 N. Y., 394; 2 H. & M. (Va.), 317; 18 Grattan, 140, 144, etc.; Blackwell on Tax Titles, p. 608 et seq.*

EAKIN, J.   In January, 1882, appellant by petition applied to the Chancery Court for confirmation of a tax title to certain lands, which on the fourteenth day of July, 1879, had been returned by the collector to the county clerk as delinquent for the taxes of 1878. After one, and in less than two years from the date of said return, Bagley "redeemed" them from the county clerk, and obtained a deed of conveyance, which he sets forth. There is no

Bagley v. Castile.

question of the regularity of the proceedings or of the delinquency up to the time of the return of the list. Notice was given of the petition by proper publication. Two of the former owners in whose names some of the lands were listed, appeared, and severally demurred, alleging that the petition showed no ground for relief. After several amendments of the bill, the court sustained the demurrer of one of the parties, and Bagley rested. The petition was dismissed, and he appeals.

The act upon which he relies was passed on the fourteenth of March, 1879, "to provide" as its title expresses, "for the redemption of delinquent lands." By the first section, it directs that all lands thereafter returned as delinquent, shall remain in the office of the county clerk for one year; during which time they may be redeemed by the owner, or the person in whose name they were listed.

By section 2 it is provided that if not thus redeemed, they shall remain in the clerk's office a year longer, during which time they shall be " subjected to redemption by any person whatever, who will pay the tax, penalty and costs," and that the clerk shall execute and deliver a "*proper deed of conveyance.*"

If redeemed in neither mode, it is provided in section 3, that they shall be " deemed and held as forfeited, and the property of the State," and certified as such to the Commissioner of State Lands. There is a saving as to the rights of minors, *femmes covertes* and persons in confinement. Bagley has conformed with the statute. His title should have been confirmed, if the act contemplates that the clerk's deed of conveyance shall operate as a complete investiture of title; and, if so construed, the act be not unconstitutional. These are the questions presented for our consideration. With the policy of the act, or its hardship, we have nothing to do, save as they may affect the question of constitutional power.

Bagley v. Castile.

It is contended, in support of the demurrers, that the object of the act is clearly indicated in the title, and that it contemplated *redemption* alone, and not a sale. That the terms "redeemed" and "redemption," which alone are used in the effective sections, are not words of purchase. That they properly mean a restitution of something previously owned, but burdened or lost; and are not applicable to a purchase by a stranger who never had any previous interest.

That the transaction contemplated must occur before the forfeiture is provided to take place, and whilst the title remains in the former owner; and, in short, that the whole effect intended was to prevent a forfeiture at the end of two years, and to sanction a friendly redemption by another; or to subrogate the person who redeems to the lien of the State for the repayment of advances, and that in any other view the act is unconstitutional.

To this it is answered that such a construction is not reconcilable with a provision for a " deed of conveyance," which is a term only applicable to a transfer of title, and has been heretofore the usual mode of vesting tax titles, in contradistinction to a mere certificate of purchase. That the terms " redeem " and " redemption " have a popular sense wider than their strict derivative signification ; and that a different construction would contravene the true policy of the act by defeating all inducement to others to pay the taxes and take the land, after an original default by the owner, and a persistent delinquency of a year.

In short, that the power to redeem means, in the act, the power to get from the State a title to the land itself; and that the State has the power to give that, under its right to take control of the delinquent lands, and dispose of them for the taxes, after such time as she may have prescribed by law for their redemption by the owner.

6

It is very plain that the statute, throughout, can not be literally construed; that the Legislature has not been careful to express its meaning in explicit terms; that, in one place or another, it has used language not to be taken in its ordinary sense. In such cases, verbal criticisms and exact definitions can lead to no satisfactory result. They only aggravate perplexity. The courts must seek the true legislative intent in the objects and purposes of the act, not disregarding the language, but giving it such meaning as they may fairly suppose the Legislature intended.

Discarding all hypothesis of a fraudulent, oppressive or otherwise improper object, the act could have had but one. That was, obviously, to relieve delinquents, the counties and the State from the expenses of publication and sales. Whether that were wisely done is not the question. No other intention is imputable, for publication and public sale could have no other conceivable mischief.

At the same time the State could not wholly renounce her revenues, and as this time had been given to delinquents without accumulation of costs, some means were necessary of inducing speedy payment. It was not unnatural to provide that if the delinquents should delay another year, they might have reason to fear that their property might be lost; and, to make this effectual, to provide that the clerk, as an officer of the State, might convey the title to any one who might advance the taxes.

It had never been the practice under the revenue laws of the State to make conveyances to tax purchasers whilst a right of redemption remained outstanding, save in cases of persons under disability. Certificates of purchase only had been issued to purchasers. It is much more probable that in the directions to execute a proper conveyance, the Legislature meant it to have the effect which conveyances had always had, than that they meant to use the word re-

Bagley v. Castile.

deem in its strict derivative sense of buying back, or taking for the benefit of one who had a former interest.

We therefore construe the act as limiting the right of the owner to redeem, to one year. After that, he has no peculiar privilege over any one else who will pay the taxes. There is, it is true, no express repeal of the power given by the general revenue act to redeem in two years, nor do we mean to hold that such a right is inconsistent in the nature of things with a deed given to a tax purchaser. They co-exist in the revenue system of other States (*Baker v. Kelley, 11 Minn., 480*), and in our State also, in favor of persons under disability. They co-exist in favor of minors, *femmes covertes*, and persons in confinement under the law now in question. It may be remarked in passing, too, that the saving of these classes in the section providing for the deed, affords an additional indication that the Legislature never intended with regard to others that their right to redeem should survive the execution of the deed. If it did, why not include them also in the proviso?

It is not, therefore, because there might not be a deed of conveyance, which would be subject to redemption, if the Legislature had intended it; but that we think, in view of the general revenue system which had always prevailed here, the Legislature did not intend that the deed of conveyance, in contradistinction from a certificate of purchase, should have no other effect than the latter would have had. The act meant to pass full title save as to the classes in the proviso.

Thus construing the statute, the next consideration regards the power to pass it. Can we say with any tolerably firm conviction of mind that it violates any constitutional provision? If not, we must sustain it, regardless of its policy or our doubts.

1. TAXATION: Power of the Legislature.

Bagley v. Castile.

The members of the legislative department are bound by the same oath with those of the judiciary, to support the Constitution, and have the same opportunities for understanding it. They must, in the first instance, determine whether their acts are authorized by that instrument; and all courts, now, everywhere, recognize the duty of respecting their conclusions, unless they be clearly erroneous.

The Constitution of 1874 declares, in section 8 of article 11, that no one shall be deprived of his property without due process of law; and in section 21 of article 11, that no one shall be deprived of his property except by the judgment of his peers, or the law of the land. In section 22 it is declared that the right of property is before and higher than any constitutional sanction.

But the same section does further declare, what is practical and very important, that private property shall not be taken, appropriated or damaged for public use, without just compensation therefor. It is contended that the law, if construed as we have done it, infringes some or all these provisions.

As to what is "process of law" and "the law of the land," has been much discussed by the able jurists, both in courts and text books on constitutional law. It is useless to add to the mass of discussions. Suffice it here to say, that it is now universally conceded that this clause does not apply to inhibit summary proceedings of States to collect the revenue essential to their existence, operating equally on all citizens. The principal object of revenue laws is not to deprive any individual of his property, as property. The State does not desire his property, and has no use for it when taken. It simply desires and commands each citizen to contribute to the State his due proportion of the State expenses in money, uniformly, each with all others, in proportion to the amount of benefit received in

Bagley v. Castile.

the protection of life, liberty, tranquillity, and property. It calls upon him to perform *a duty* in paying his taxes—one indispensable to the existence of the very government which calls—a duty which only citizens or property holders can discharge—a duty which will brook no delay. It is a political necessity that each government shall have the power to enforce this duty by summary process; by forfeitures and penalties. If it can not do that it would be absolutely helpless. It could not await the " process of law " if that term be confined, as some have done it, to judicial determinations. In a larger sense, tax proceedings under uniform laws *are* due process of law, and tax laws are laws of the land.

In either view the forfeiture and sale of lands by summary process, for the purpose of enforcing the payment of taxes, have not been considered by most courts as that deprivation of property which our and similar constitutions meant to prohibit. All have recognized their necessity.

The twenty-second section simply regards the exercise of the right of eminent domain, which is something wholly different in nature from the taxing power. The latter calls upon all persons alike for the performance of a civil duty, and enforces that duty, which each and all owe the State, without any compensation beyond protection. If in compelling that performance by the only practical means suitable to the emergency the State causes a citizen to lose his property, it is an incidental consequence, from which the State derives no benefit beyond her dues. The property is not taken for public use. It is lost to the owner by his own default, in favor of one who has discharged the owner's duty.

By the exercise of the right of eminent domain, property in kind, more than the owner's fair share of the public burdens, is taken for the public use, and either held by the

Bagley v. Castile.

State or given to those who construct and keep up works useful to the public, in view of the public benefit. No one is under an obligation to suffer this peculiar burden for his fellow-citizens, and if his property be taken he must be paid.

The Constitution seems to have guarded against its own misconstruction very carefully, with regard to the prohibitions commented upon. Section 23 of the same article provides that "the State's ancient right of eminent domain *and of taxation* is herein fully and expressly conceded." This must mean the power to impose and collect taxes by the ordinary methods.

It can not, then, be reasonably said that either of the above mentioned inhibitions are violated by providing for a sale of the lands for delinquent taxes, and by taking the title from the former owner to vest it in another, without such process of law *as consists in judicial proceedings and determinations.* If there be any constitutional objection to the act under consideration it must be to the *modes* by which the Legislature has endeavored to make the property taxed subservient to a reasonably expeditious collection of the taxes which are imposed upon it.

We have concluded that the power to seize and dispose of the lands by these exceptional methods, for purposes of revenue, are based upon necessity and immemorial usage. If the State, with regard to her revenue, were brought within the scope and purview of the clause of the Constitution by which the inviolability of private property is in all other cases guaranteed to the citizen, not only against violence from others, but against aggressions from the State itself, it would be apparent at once that this act is unconstitutional. But as she is not, then the further inquiry arises as to what really *is* the extent of her powers; or are they wholly unlimited or uncontrolled save by the

sense of responsibility on the part of legislators as individuals?

The Constitution recognizes her " *ancient* right of eminent domain and of taxation." *Art. 2, sec. 2.*

Ancient means old, that existed in former times. ( *Webster in verb.*) The right to tax implies the power to collect. The use of the word ancient is not rhetorical, for the purpose of conveying the information that such rights always existed here, and in the governments whence ours is derived. It is limiting and qualifying, and alludes to those powers of imposing, and modes of collecting, based upon necessity and immemorial usage, or rather common usage, which had been theretofore employed. It justifies them, and such analogous modes of collection as might rest upon the same principle with the others.

Concomitant with this, and in the same bill of rights, occurs the recognition of the ancient, absolute and universal right of private property, which is before and *higher* than any constitutional sanction. (*Art. 3, sec. 22.*) Why this? It is mere fourth of July declamation, if it does not mean that the sanctity of private property is the primal underlying idea of all free governments, taken for granted as the basis of all written constitutions, and needing no express guarantees in the instrument. The declaration would be pompous nonsense, if the legislative body, finding no express protection of private property in specific inhibitions, might destroy it at will, through the crevices of the shield. By the Constitution itself, the sanctity of private property is the *prima facie status*. It may not be invaded save as allowed. That being the voice of the Constitution itself, does not contravene the well established doctrine that the State Legislature may exercise any powers of a legislative character not forbidden by the Constitution of the State, or that of the Federal Government.

It would be a fallacy to say not expressly forbidden. It may in *no* case, unless empowered, violate rights which underlie all written constitutions, and are recognized to do so. No law, for instance, could be maintained which would make it even a misdemeanor to live with one's wife, or buy clothing for his children, and yet there is nothing in the Constitution expressly guaranteeing these rights against legislative invasion. They are tacitly recognized as underlying constitutions.

The revenue powers of the Legislature can not, we think, be extended beyond those modes for collection which the Legislature may fairly consider necessary and appropriate for the objects in view, or at least fairly convenient to effect them without wanton and unnecessary injury or sacrifice of private property, and the powers must be exercised in accordance with the principles, at least, if not according to the exact modes, which aforetime had been used in our own State, and in similar free governments. Neither the recognition of the State's *ancient* right of taxation, nor the ground of necessity, nor former recognized usage, which are the only grounds upon which summary proceedings can rest, will justify novel modes of collection, which are wanton and oppressive, and which violate the general constitutional guarantees by which all private property is guarded, and which do not appear to be necessary.

That the provisions of the law under discussion are not at all necessary to the support of the government, is apparent from the fact that nothing like them exists, or has ever existed in England, or in this State; and, so far as I am advised, do not now exist in any sister State, all of which maintain their governments by the collection of revenue.

It is complained of this law that it is a legislative forfeiture of property without legal form or procedure, and

Bagley v. Castile.

without judicial determination. That has been a valid objection in several States, and especially with regard to a law of Congress passed for the collection of taxes in the "insurrectionary districts," as Congress was pleased to term them, in 1862. In a batch of cases depending on this law, brought to the Virginia Court of Appeals in 1868, and considered together, it was held that Congress had all the powers for enforcing the collection of taxes that were in use by the Crown of England, or were in use by the States at the time of the adoption of the Constitution of the United States. In that view it was held that Congress had not the constitutional power to impose the penalty of forfeiture of lands for the non-payment of taxes. Further, that the power to *sell* the lands for taxes was limited to the object, and that a law which required the sale of the *whole* land in all cases, without regard to the fact that it might be divided without injury, and the tax made by a sale of a part, was unconstitutional. *Martin v. Snowden, Trustee, 18 Grattan, 100.*

Of course this authority is not directly in point, nor directly applicable to this case, because modes of collecting taxes had been in use here, and gone unchallenged, different from those commonly in use before the adoption of the Constitution of the United States. But it *is* directly in point to establish two principles of judicial construction of the vague revenue powers of the legislative body. They are, first, that the general powers for this purpose expressly or impliedly granted by the Constitution, must be measured by usages obtaining and well recognized at the time of its adoption; and second, that any such disposition of the property as would arbitrarily cut off from the owner all possibility of benefit from the excess of value over the taxes, would be an abuse of a power resting on a necessity for a particular purpose.

In the case of *Kinney v. Beverly, 2 Hen. & Mun., 317,* a law was discussed which provided that a delinquent list ·should be returned by the sheriff, and that the county court should direct it to be certified to the Auditor of Public Accounts. If the taxes were not then paid in three years, the statute provided that the right to such lands should be forfeited and lost, and that the Auditor might sell them. There was, as in this case, a saving of rights for infants, *femmes covertes,* etc. In an opinion delivered by that eminent jurist, Judge St. George Tucker, the court held the act invalid for several reasons. It was held to be in violation of Magna Charta and the English common law, to declare forfeitures without office found, or some legal pro- ·ceedings; and, in the case then in judgment, it was specially noted that the plaintiff, by this law, had been disseized of his lands; and that they had been granted over to a *third person* without any notice or warning whatever. This, at least, is precedent for saying that the filing of a delinquent list in the county court, and a certificate made to the Commissioner of State Lands by order of the court, is not notice or warning to the delinquent.

A similar question arose in Mississippi in 1860 (*38 Miss., 9 George, 424*), upon a statute very much like the one now considered. It began as ours, by cutting off all further sales of lands for taxes, and requiring the delin- quent list to be returned to the board of police. The board were then to examine it, and order the clerk of the probate court to certify it, and post a copy at the court house, and send one to the Auditor. The Auditor was then required to record it, upon which it was provided that the title should vest in the State, subject to be redeemed in two years, by any person interested in the land. This law was held void, Judge Handy dissenting. The court, in an ·opinion delivered by Harris, J., concedes the power to the

Bagley v. Castile.

Legislature " to pass laws providing for the collection of taxes in the most summary manner, without the tedious formalities which ordinarily environ the private creditor." But denies the power to pass the law in question there, because " the land of the defendant, without notice, actual or constructive, without his consent, without compensation, without necessity for public use, and without due course of law, is attempted to be wrested from him, and, for a nominal consideration, vested by the power of legislation alone in the plaintiff." In conceding the right to use summary modes, the court says " no private right, no constitutional provision, no great principle which lies at the foundation of our political system must be violated."

Adding for this court the word "unnecessarily," these views seem sound, and to recognize the true limit of legislative power.

There had never been in this State before the adoption of the Constitution of 1874 any proceeding for taking lands for taxes, without notice by publication and a competitive sale either of the smallest quantity for the taxes or the best price for a whole tract, with provisions to save the excess to the purchaser. This statute seems to violate all the commonly recognized rules of common justice; and being unprecedented here, and similar statutes in other States having been strangled by the courts in infancy, it is not presumable that the Constitution had such powers in contemplation when it declared the State's ancient right of taxation and eminent domain. The act is void.

The court is of the opinion, however, that, under the circumstances of the case, the petitioner Bagley would have an equity to be reimbursed the amounts paid out to relieve the lands from taxes. The act was short-lived and has been since repealed. Doubtless many purchases from the State have been made under it in good faith, and, as they

*Revenue act of 1879 void, but tax purchasers have liens for taxes paid.*

have inured to the benefit of the owners, it would be inequitable that the owners should be thus relieved at the expense of those who had relied upon what they had good reason to believe was a valid act of the sovereign power. For the equitable adjustment of all such cases growing up whilst the law was supposed to be in existence, it is reasonable that those who have paid the taxes should have a lien upon the lands for the burdens discharged, not only by the original purchase, but by the payment of the taxes of subsequent years.

This bill was framed with a view to such alternate relief. The constructive service was such as is prescribed for confirmation of tax titles, and does not bring in, for this purpose, any defendants not made parties and served by process appropriate to suits between parties to enforce a lien. The petitioner had dismissed the suit as to the tract claimed by one of the parties who had demurred.

With regard to other parties actually appearing, however, it would have been good practice to have retained the bill, and, unless proper defense had been made, to have granted the alternative relief against her and her lands. And leave might have been given to bring in other parties by actual, or fit constructive service, no question being made as to improper joinder of defendants.

The bill has some equities in this view, and it was error to sustain a general demurrer, although the Chancellor was correct in his opinion that the law was unconstitutional.

Reverse and remand, with instructions to overrule the demurrer, and for further proceedings in accordance with this opinion, and the principles and practice in equity.