## BEEBE *v.* LITTLE ROCK.

### Opinion delivered March 31, 1900.

1. COVENANT—CONSTRUCTION.—The original proprietors of the land whereon the city of Little Rock is situated, having preemption rights therein as first settlers, in 1821 dedicated certain streets to the town (afterwards city) of Little Rock. In 1838 Beebe covenanted, if he obtained a patent deed of the land, to quitclaim to the mayor and aldermen of Little Rock and to others any lot or lots in said city claimed by virtue of a regular claim of conveyance from the original proprietors. *Held* that the city of Little Rock was one of the beneficiaries of the covenant, and that the covenant bound Beebe to quitclaim to the city his after-acquired legal title to the streets so dedicated. (Page 54.)

2. MUNICIPAL CORPORATION—AUTHORITY TO EXCHANGE STREETS for other property is not vested in the mayor and council of a city. ](Page 62.)

3. SAME—EFFECT OF ULTRA VIRES ACT.—Where city officials, without authority, exchanged certain streets for other land, the transferees cannot bring ejectment for such streets, though the city retained the land for which they were exchanged. (Page 66.)

4. STREETS—ABANDONMENT.—Where the original proprietors of a town site dedicated certain streets to a city, and the patentee of such site obligated himself to quitclaim all lots in said city held under conveyance from the original proprietors, the city will not be held to have adandoned so much of said streets as the patentee failed to include in his quitclaim deed. (Page 68.)

5.  SAME.—A city will not be held to have abandoned a street by leasing it or by delaying to open it.  (Page 68.)

6.  SAME.—A street is not abandoned because another than the city has paid taxes on it.  (Page 69.)

Appeal from Pulaski Circuit Court.

ROBERT J. LEA, Judge.

*J. M. Moore* and *Cockrill & Cockrill*; for appellants.

The recital in the deeds passed between Beebe & Ashley and the city in 1843 that the city had previously accepted the plat and bill of assurances in satisfaction of the covenant is proof of that fact.  2 Pars. Cont. *512; 2 Devlin, Deeds § 845, p. 1134.  No part of the property claimed here had ever been dedicated or recognized as a highway before the confirmation of the above mentioned deeds.  Russell was not the owner, and therefore his attempted dedication was void.  42 Ark. 66, 68; Elliott, Roads & Streets.  Beebe's covenant of 1838 did not refer to a dedication of streets, and the evidence is not of the character to support such dedication.  2 Dill. Mun. Corp. § 639; 63 Ark. 5; 66 N. Y. 261; 87 Ill. 64.  The public had no interest in the rights which Beebe's covenant gave to those who claimed under deeds from the "original claimants."  19 N. J. Eq. 386, 393; 18 Mich. 56; 141 Ill. 89; 81 Cal. 70; 122 N. Y. 197, 214, and cases; 144 N. Y. 316, 326; 37 Mo. 13; 72 Mich. 234; 88 Mo. 155; Washb. Easments, * 141, § 22; 21 Col. 1.  If it were true that Beebe did dedicate the land by the covenant of 1838, he had a right to withdraw the offer at any time before its acceptance by the city.  Washb. Easments, 233, 208, 222; 27 Am. Dec. 564, n.; 124 Ill. 234. 242; 47 N. E. 191; 14 Mich. 12; 39 N. J. Eq. 465; 50 Ark. 53, 57; 58 Ark. 142; 59 Ark. 35, 39; 63 Ark. 5; Elliott, Roads and Streets, 113–114; 2 Smith's Lead. Cas. (Pt. 1), 140, 162 and cases; 88 Mo. 155; 2 Beach. Pub. Corp. § 1454; 72· Mich. 249; 14 Mich. 12; 81 Cal. 70; 67 Tex. 345; 18 Mich. 320, 346; 21 Cal. 1; 144 N. Y. 316, 326; 27 Am. Dec. 562, 563; 117 N. C. 733; 45 N. E. 1050; 37 N. E. 709; 100 Cal. 302; 53 Ark. 191, 194, 195; 2 Dill. Mun. Corp. § 629, and p. 742 n.

As to character of acts required to constitute acceptance, see: 90 Am. Dec. 224; 144 N. Y. 316, 325, 325; 141 Ill. 89, 104, 105, 108; 44 Mich. 468, 477, 478. An acceptance of a part of the streets laid out on a plat is not an acceptance of the whole. 47 N. E. 191; 141 Ill. 109; 14 Mich. 12; 31 Mich. 281; 47 Mich. 389; 75 Mich. 409; Angell, High. § 157; 68 Ia. 296; Washb. Eas. 239; 63 Ark. 5. If there had been both a dedication and acceptance, the city had the power to renounce its rights at any time before the actual opening of the streets and the acquisition of vested rights. 63 Ark. 5; 7 La. Ann. 270; 2 Dill. Mun. Corp. § 712n. and § 632; Ell. Roads and Sts. 119. The presumption is that the council acted rightly. 50 Ark. 266; 31 Ark. 609; 73 Fed. 940, 945; 12 Wheat. 64, 70. If the lot owners were parties to this suit, none but abutters on the property in suit could be heard to complain. 37 N. E. 709; 82 Md. 77; 33 Md. 270; 151 Mass. 79, 81; 129 Mass. 167; 11 Allen, 5, 8; 19 N. J. Eq. 386, 394; 107 Ill. 600; 7 How. 185, 193; 50 Ark. 466, 474. The contract for the acceptance of the dedication having been fully executed on both sides, and the city still retaining the consideration received by it under the contract, it can not now be heard to assert that the act was *ultra vires.* 5 Thompson, Corp. §§ 6024, 6018; 47 Ark. 269, 284; 48 Ark. 254, 256; 1 Dill. Mun. Corp. §§ 444, 675; 2 Herman, Est. §§ 1178, 1222; 96 U. S. 312, 315; 96 U. S. 258, 267; 21 Kent, Com. 381; 64 Fed. 36, 44–7. Further, the city is estopped from denying the terms of its own contract of acceptance. 47 Ark. 317; 53 Ark. 514; 2 Dev. Deeds, §§ 997, 845; 2 Pars. 512; 60 Ark. 212; 18 How. 82; 11 How. 297; 2 Whart. Ev. §§ 1039, 1040. That the mayor was duly authorized by ordinance to make the release is proved by the recitals in the deed. 2 Whart. Ev. §§ 1039, 1040; 1 Greenlf. Ev. §§ 23, 211; 73 Fed. 945, 950; S. C. 20 Ct. App. (U. S.) 122; 101 Cal. 522; 12 Wheat. 945, 950; Tied. Mun. Corp. § 196; 60 Ark. 212; 55 Ark. 289–90. The payment of taxes by Beebe, and acceptance of same by the city, estops the city. 164 U. S. 559, 577; 49 Ia. 630; 50 Ia. 164; 39 Ia 507. The agreement to dedicate did not amount to a dedication. 7 Ark. 253; 48 Ark. 165; 51 Ark. 433; 33 Ark. 78. The city's

laches in enforcing this contract bars its rights.    41 Ark. 45,
50; 2 Dill. Mun. Corp. § 675; 55 Ark. 148; 38 Ark. 81; 43
Ark. 180, 184; 164 U. S. 559, 576; 37 U. S. Ct. App. 220; S.
C. 69 Fed. 116; 34 Fed. 701; S. C. 140 U. S. 634; 2 Perry,
Tr. § 870; Newell, Ej. pp. 754, 755 and 759, § 68.    If the
land was ever a street, it reverted to appellants, on being aban-
doned by the city.    150 Mass. 174; Elliott, Roads & St. 670; 59
Ark. 66, 79; 12 Vt. 15, 20; 7 Wall. 290.    If the property
in suit were a public street, the plaintiffs, as owners of the fee,
could maintain ejectment to remove obstructions.    24 Ark. 102;
50 Ark. 466; 2 Wall. 58.

*Dodge & Johnson,* and *Carroll & Pemberton,* (for Athletic
Association); and   *Jno. W. Blackwood* (City Attorney), for
appellees.

.The appellants are estopped to claim the property.    The
questions of fact in this case were fully considered and  passed
on in *Martin* v. *Skipwith*; 50 Ark. 141.    The plat shows no
north line to Water street.    This plat must govern, though in
conflict with the bill of assurances.    Elliott on Streets & Roads,
111; 100 Ind. 463.    Any fragments of land between the river
and the street passed in the dedication, since no designation
was made of them on the plat.    16 Wis. 19; 1 L. R. A. 856.
It was *ultra vires* for the city council  to attempt to  renounce
title in streets once dedicated.    31 S. W. 784; 50 Ark. 473;
51 Ark. 500; Elliott, Roads & Streets, 358; 7 B. Mon. 600;
1 A. K. Marsh. 9; 8 Dana, 50; 3 B. Mon. 437; 14 Pa. St.
186; 2 Dill. (U. S.) 70; 90 Mo. 259; 104 N. Y. 405; 29 Ia.
68; 23 Vt. 92; 1 Whart. (Pa.), 469; 12 Ill. 38; 41 Fed. 649.
If this were not true, the facts of the contract of exchange
relied on as estopping the city are insufficient, in that the par-
ties clearly did not contemplate that this property was included
in the exchange.    34 Me. 394; 50 Pa. St. 17; 103 Pa. St. 631;
10 C. B. 35.    Nor did the act of its officers in receiving taxes
on the land estop the city.    42 Ark. 121; 39 Ark. 580; 40
Ark. 257.    Use of a street by the public, working of it by
the authorities, etc., are evidence of acceptance.    58 Ark. 494;
62 *ib.* 408; 58 Ark. 142.    Acceptance of part is acceptance of
all of a street, as set out on the plat.    8 Am. & Eng. Enc.

Law, 402, 403; Elliott, Roads, 115, 116. The city had the right to say when the street should be opened and worked. 58 Ark. 142. The city is not barred by laches. 50 Ark. 141. Appellants themselves are barred thereby. 17 Fed. 36. There is no land left between the north line of Water street and the highwater mark. The city has never abandoned these streets.

*Jno. M. Moore*, and *Cockrill & Cockrill*, for appellants, in reply:—A riparian owner takes to the water's edge. Gould on Waters, § 76; 7 Wall. 273; 53 Ark. 314.

*S. R. Cockrill* and *J. M. Moore*, for appellants, on motion to reconsider.

The officers of the land department could not impose conditions upon the issuance of Beebe's patent. 14 How. 377. The city can not repudiate its contract and retain the benefits of it. 47 Ark. 317; 53 Ark. 514; 48 Ark. 258; 32 Ark 346. Even though the ordinance authorizing the city's deed is not in existence, its recital in the deed is sufficient evidence of it. 1 Dev. Deeds, §§ 348a, 335; 161 U. S. 434, 442. By accepting the deed of Beebe & Ashley, the city agreed to its conditions and the consideration upon which it was executed. Dev. Deeds, § 997; 4 Pet. 1, 5; Big. Est. § 371. The city is bound by the recital, of the covenant, in the deed. 2 Pars. Cont. 512; 2 Dev. Deeds, §§ 845, 1134; 18 How. 82; 2 Whart. Ev. 1039–1040; 118 U. S. 256, 260; 60 Ark. 212; 58 Ark. 289, 290. When a street is bounded on one side by a navigable stream, the vendee of lots abbutting on the street takes only to the center of the street, subject to the public use. 2 Wall. 57. The city cannot retain both the property and its price. 5 Thompson, Corp. § 6018; 12 C. C. A. 14, 22. Even in an *ultra vires* contract, there may be an estoppel, in whole or in part, based upon what has already been done. 1 Dill. Mun. Corp. §§ 444, 675. Public rights in a street may be lost by non-user. 41 Ark. 45; 2 Dill. Mun. Corp. §§ 667, 675.

*Walter J. Terry* and *Jno. W. Blackwood*, for appellees, on motion to reconsider.

Beebe was estopped from inquiring into Russell's title. For the judicial history of the title set up in this case, see 50

Ark. 147; 14 How. 377, 386; Hempst. 704. This court can take judicial notice of these facts. For many similar instances, see 45 Ark. 87; 37 Ark. 577; 6 Ark. 123; 4 Ark. 302; 27 Ark. 137; 28 Ark. 378; 34 Ark. 224; 16 Ark. 62; 61 Mo. 76; 70 Ia. 275; 21 Ind. 443; 16 Cal. 220; 50 Ala. 537; 93 Mo. 452; 107 Ind. 343; 13 Ct. Cl. Rep. 117; 67 Ga. 260; 18 La. Ann. 497; 49 Ark. 87; 31 L. R. A. 731; 32 *id.* 610; 45 Mich. 135; 56 Ind. 173; 23 Mo. App. 451; 51 Mo. 126; 107 Ind. 343; 78 Mo. 623; 61 Ind. 97. The public streets are trust property, and their trustees cannot sell or dispose of them, either directly or indirectly. 50 Ark. 473; 51 Ark. 500; 41 Fed. 649.

BUNN, C. J. This cause originated in three several actions of ejectment, by the appellants, as the only heirs at law of the late Roswell Beebe. The first suit was against the city of Little Rock, and the City Fuel Company, and W. L. Greer, to recover the tract of land in said city bounded on the east by Cumberland street, on the west by Main street, on the south by Water street, and on the north by the Arkansas river. The second suit was against the city of Little Rock and Neimeyer & Darragh, for the recovery of the tract of land or lot in said city bounded on the east by Broadway street, on the west by Arch street, on the south by a line 140 feet north of and parallel to Water street, and on the north by the Arkansas river. The third suit was against the city of Little Rock and the Athletic Association for the recovery of a strip of land in said city bounded on the south by Water street, on the east by Main street, on the north by the Arkansas river, and on the west by a line one hundred and fifty (150) feet west of and parallel to Main street. The first strip or parcel of land is not further described by reference to plat or numbers. The second tract is further described in the complaint as the northern part of block 185, according to the plat of Beebe, filed with his bill of assurances December 26, 1839, being the north fractional half of that block fronting on the Arkansas river, and therefore with irregular north boundary, the west end being (from the plat exhibited) more than 150 feet, and the east end less than 150

feet wide.  The third strip or tract is not further described in the complaint by reference to map or number.

The same plaintiffs, and none others, being in all three of the suits, and the city of Little Rock being the common defendant in all of them, the other defendants being merely tenants and lessees of the city, and withal each of the suits involving identically the same legal propositions for the most part, they were all heard and determined in the lower court as one suit, and will be so heard here.

In support of their complaint as the owners of the tracts of land in question, plaintiffs exhibit and declare upon a patent from the United States government, dated September 25, 1839, which conveyed to Roswell Beebe, ancestor of plaintiffs, the congressional subdivision of the land including the parcels of ground in controversy.  They also allege that defendants had been in possession of the ground in controversy without right for ten years next before the filing of their complaint herein. But they say that they instituted suit in the Pulaski chancery court for this same property against these same defendants, on the 2d day of April, 1866, which was dismissed without prejudice on the 18th day of June, 1892, and that within one year thereafter this suit was instituted.

For answer and amendments to answer the defendants say, in addition to special and individual answers, that the defendant, the City of Little Rock, had been in the open, notorious and peaceable adverse possession of the property in controversy for more than fifty years, up to the filing thereof; that all of the same form, include, and constitute part of the streets, alleys and public grounds of the city of Little Rock, deeded to said city and by bill of assurances dedicated to the public use on the 20th day of November, 1821, by William Russell and others, the original owners and proprietors of said lands by right of purchase from the United States government.  They say that plaintiffs' right of action did not accrue within fifty years next before the filing of this suit, and that the same is barred by prescription, because neither plaintiffs nor their ancestors had ever before made any claim to the land in controversy.  The answer then sets up the several acts of congress passed April

12, 1814, for the final adjustment of land titles in the state of Louisiana and territory of Missouri, and another act approved February 5, 1813, and another April 29, 1810, under which one Benjamin Murphy, under improvements on the land in controversy by one William Lewis, under whom he held, claimed the right of pre-emption on said lands, and a preference right to enter same from the government; that under an act approved March 17, 1820, entitled "An act to authorize the President of the United States to appoint a receiver and register and establish a district land office at Batesville, Arkansas," said office was established, and afterwards, to-wit, in the month of September, 1820, the pre-emption claim was presented and allowed at said land office. Reference is made to transcript of the record of these proceedings marked "Exhibit B," but the exhibits do not appear in the transcript before us. Then the answer contains a history of the transmission of title from Murphy to William Russell and others, constituting what are known and called "original proprietors." The defendants further say that on 20th November, 1821, the said William Russell and others, owning the lands as aforesaid, made, executed and established a plat of survey, laying off the whole of said lands as aforesaid into town lots, blocks, squares, streets, alleys, etc., and called the same the "Town of Little Rock," and also on the same day executed a sealed instrument, called therein a "Bill of Assurances," in which the said owners, as aforesaid, makers thereof, were denominated "owners and proprietors" of the town of Little Rock, declaring therein the size of the blocks, squares, lots, streets and alleys in said town, which said bill of assurances was duly acknowledged and recorded in the recorder's office of Pulaski county on February 6, 1822, and a copy of same is exhibited with the answer, and appears in the transcript. Defendants also present a copy of what is termed "the covenant" of Roswell Beebe, dated July 6, 1838.

In addition to the patent aforesaid, plaintiffs presented in evidence the bill of assurances of their ancestor, Roswell Beebe, to the city of Little Rock, dated and filed for record December 26, 1839, and mutual deeds on exchange of property between

Beebe and Ashley and the mayor of the city of Little Rock, dated 23d day of February, 1843, in which the four blocks constituting Mt. Holly Cemetery were conveyed to the city in exchange for other property.   Oral testimony was also taken, and made of record in the bill of exceptions.

In the trial of the cause, plaintiff asked the court to give nineteen several instructions to the jury and declarations of law, which were severally overruled, and plaintiffs excepted, and thereupon the court made the following declarations and instructions in the case:

(1).   "The court finds that by the bill of assurances and plat filed by William Russell and others, as original proprietors of the city of Little Rock, the city of Little Rock obtained a proper claim of title through said original proprietors to the land in controversy.   (2).   That the city of Little Rock accepted the streets under the Russell plat, as shown by said plat, in trust for the use of the public.   (3).   That no subsequent acts of the officers or municipal council of the city of Little Rock were such as to estop the city from setting up title to the land in controversy as public streets.   (4).   That, by the covenant of Roswell Beebe to and with the mayor and aldermen of the city of Little Rock, he was bound, upon reasonable demand, upon the emanation of the patent from the United States to him, to have immediately executed a quitclaim deed to said city to the streets as shown by the Russell plat and bill of assurances.   And accordingly, upon the undisputed facts of this case, the court finds the law to be for the defendants, and accordingly instructs the jury to return a verdict for the defendants in all three cases herein submitted to them."

The plaintiffs excepted to each of these findings and instructions of the court, and filed their motion for new trial, which was overuled, and they appealed.

The instructions of the court to return a verdict for defendants in effect eliminated all the questions from our consideration, except those arising upon the facts as to ownership of the ground in controversy.   This cause was decided once before by us, but a motion for a new hearing was filed, and, while this was pending, the term was about to expire, and

we set aside our decision and judgment, to allow further time to consider the matter. We have examined most carefully all the matters suggested to us both on original argument and on motion for rehearing.

What are known as the "original proprietors," claiming to be the owners of the land upon which the city of Little Rock is now in part located, and of the lands particularly of which the ground in controversy forms a part, by their bill of assurances, dated November 20, 1821, which was immediately put on record in Pulaski county, dedicated certain of said lands, including the ground herein sued for, to the future town and city to be called "City of Little Rock." Accompanying this bill of assurances or dedication deed, and attached thereto as a part of the same, was their map of so much of said city as was conveyed by them therein, and additional land not claimed by them, and the streets, blocks and lots indicated on said map were specifically referred to in said bill of assurances.

The town of Little Rock, which was the territorial capital, was incorporated in 1825, and the city of Little Rock was incorporated in 1832. From its incorporation as a city, the city council took steps to improve the streets dedicated to the city by the "original proprietors," and particularly looking to the improvements of Water street and North street, parts of which comprise the ground now in controversy. There was no statute in force providing for the manner of accepting dedications on the part of towns and cities, but acceptances were under the common-law rule. The evidence, in our opinion, is sufficient to show an acceptance on the part of the town and city of the dedication of these "original proprietors."

It appears that the title of the "original proprietors" had never been perfected, and in the course of time Roswell Beebe, ancestor of the plaintiffs in this cause, made application to enter the congressional sub-division described in his patent, and finally succeeded in doing so, and obtained his patent. The same is exhibited with his complaint herein. But before doing so he made what is here termed his "covenant" with the city of Little Rock and others, a greater part of which it is necessary for us to set out.

The covenant, bearing date July 6, 1838, is an instrument under seal, duly acknowledged and recorded, and purports on its face to be an obligation on the part of Beebe that, as soon as he should receive his patent, if he ever should, from the United States government for the lands including the grounds in controversy as aforesaid he would make quitclaim deeds, on reasonable demand, to parties therein referred to, who should present a claim of title from all or any one of the original proprietors, referring to their plat and plan of the town aforesaid.

The circumstances under and the purpose for which this covenant was made are more fully detailed in decisions of state and federal courts in litigation growing out of the conflicting claims to these lands, made and asserted before the making of this "covenant," for, in truth, no one up to this time seems to have had any perfected title, and all were mere claims of prior rights to enter. For a history of these contentions, the following cases are referred to, in all of which Roswell Beebe, ancestor of plaintiffs, was a party, towit: *Cunningham* v. *Ashley*, 14 Howard, 377; *Russell* v. *Beebe*, Hempstead, 704.

In attempted compliance with this said covenant with the city of Little Rock, Beebe, on the 26th day of December, 1839, made his bill of assurances to her. The description of Water street was different from that contained in the bill of assurances of Russell and others, called the "original proprietors," which was thus: "Water street is and shall be forty (40) English feet wide, and no more, between block numbered one hundred and thirty five (135) and blocks or lots marked 'E,' and numbered one hundred and forty five (145)," and "all the open ground represented on the plat of said town extending along the margin of the Arkansas river, from the eastern part of the block 'A' to the western part of block 'E,' as represented on said plat, is hereby made and declared to be part of and belonging to Water street, and the open ground represented on the margin of said map extending from west side of block 'A' to the east side of block 'B,' as represented on said plat, is hereby made and declared to be part of and belonging to North street." These river margins of

4

Water street and North street, made part of said streets, and dedicated by the "original proprietors," as shown on their map, were left off said streets in Beebe's map and dedication or bill of assurances, having the effect thus of reserving the same to him. The margins or river fronts of Water street and North street are the property sued for herein by the plaintiffs.

Two main questions are raised in the part of the case we are first called upon to consider. The plaintiffs contend, first, that the city of Little Rock, as the owner of the streets, is not a party obligee in the covenant; and, secondly, that by accepting Beebe's dedication as a full performance of his "covenant" to her, if she is a party beneficiary therein, the city is estopped from claiming other property than is included in Beebe's bill of assurances as represented on his map.

Appellant's first contention is that the "covenant" of Roswell Beebe, dated 6th July, 1838, does not include the city of Little Rock, as the owner of her streets or in respect to her streets, as one of the beneficiaries therein. The "covenant," or as much of it as is necessary to be copied herein, is as follows, to-wit:

"This instrument of writing, made the 6th day of July, 1838, by and between Roswell Beebe, of the city of Little Rock, in the state of Arkansas, of the one part, and the mayor and aldermen of said city of Little Rock, in behalf of said city, as well as in behalf of the said state of Arkansas, and also in behalf of any person who may have in his own right a proper and regular chain of conveyances, or conveyance of any town lot or lots situated in the first original town (now city) of Little Rock, derived from, by, or under any one or more of the original owners and proprietors of the said town as aforesaid, and as represented upon the first original plans as then surveyed and laid off into town lots, of the other part, [the plan originally referred to is the plat attached to the bill of assurances of the "original proprietors,"] witnesseth: That whereas, the said Roswell Beebe has caused to be located and entered, with pre-emption floating claims, at the land office at Little Rock, and upon which as aforesaid (north of the Quapaw line) the city is

now built, the following described tracts or parcels of lands, to-wit, the northeast fractional quarter of fractional section three (south of Arkansas river) and the west fractional parts of the northwest and the southeast fractional quarter of fractional section two (south of Arkansas river), and west of the Quapaw line, all in township one north of the base line, of range twelve west of the fifth principal meridian; and whereas, the original town of Little Rock as aforesaid (west of the Quapaw line), now comprising a part of said city as aforesaid, is embraced and included within the tracts of land which said Roswell Beebe has caused to be located and entered as aforesaid; and whereas, the said Roswell Beebe is willing and desirous, should patents hereafter be granted and issued to him and his heirs by the United States for the said several tracts of land by virtue of the locations and entries as aforesaid, and which now embraces a part of the said original town as aforesaid, now a part of the city, to convey by quitclaim deed or deeds only to said mayor and aldermen, in behalf of said city, and to said state, and to any person or persons, his, her or their heirs, all and every the right, title, interest, claim and demand which the said Roswell Beebe may acquire to the said tracts of land by reason of the location and issuance of the patents as aforesaid to any lot or lots in said city to which they, or either of them, or their heirs, or either of them, may claim by a proper regular chain of conveyance or conveyances. derived from, by, or under some one or more of the said original owners and proprietors of the said original town (west of the Quapaw line), now a part of said city as aforesaid. Now, therefore, know all men by these presents, the said Roswell Beebe, in consideration of the premises, and also in consideration of $1 to him in hand paid by the said mayor and aldermen of said city of Little Rock, at and before the ensealing and delivery of these presents, the receipt whereof is hereby acknowledged, doth hereby for himself, heirs, executors, and administrators, promise, covenant and agree that on the first issuance of the patents, by virtue of the said locations and entries, which embrace said original town as aforesaid, he, the said Roswell Beebe, his heirs, executors, and administrators,

will, at the reasonable demand of the said mayor and aldermen of said city, or of the state of Arkansas, or of any person or persons, his, her, or their heirs, who may claim any lot or lots in the said city as aforesaid by virtue of a proper regular chain of conveyance derived from, by, or under some one or more of the said original proprietors as aforesaid, execute or cause to be executed unto the said mayor and alderman, in behalf of said city, and to their successors in office, and unto the state of Arkansas, and unto any person or persons, or his, her, or their heirs, as aforesaid, a quitclaim deed or deeds of relinquishment, thereby assigning, transferring and settling over all and every the right, title, interest, claim and demand whatever which the said Roswell may, might, or shall have acquired to each and every lot or lots so assigned and set over by reason and means of the locations and entries and issuing of the patents as aforesaid, and also with the explicit understanding that, when the said deed is so made, there shall not be had any other or further recovery to or from the said Roswell whatsoever, and such a relinquishment of dower to the premises so assigned as may have been acquired only by the means aforesaid shall be void." Then follows, under a proviso, provisions as to the demand to be made by the claimants within a reasonable time, the payment of the expense of the quitclaims, and other details, principally referring to the compliance with the covenant on the part of Beebe.

In Beebe's bill of assurances, dated December 26, 1839, three months after the date of his patent, the following reference to said "covenant" is made: "And whereas, by a certain instrument of writing duly executed by the said Beebe at the city of Little Rock, on the sixth day of July, A. D. 1838, it was among other things therein mentioned and contemplated by the said Beebe that he would, on the emanation of the said patents, relinquish to the mayor and aldermen of the said city, and their successors in office, in trust for the public use and benefit of said city and the citizens thereof, all right and title, as hereinafter set forth and described. Wherefore it is hereby declared, reference being had to the said plan, that Markham, Cherry, Mulberry, Walnut, Elizabeth, Chestnut, Holly, Hazel,

East, Rock, Cumberland, Scott, Louisiana, Center, Spring, Arch, Gaines and State streets shall each, respectively, as represented upon the said map, be and forever remain sixty feet wide, and no more, throughout their whole extent. East Main, West Main, and Orange streets [afterwards changed to Main, Broadway and Fifth streets respectively] shall each, as represented upon said map, respectively, be and forever remain eighty feet wide, and no more, throughont their whole extent; and Water street shall be and forever remain forty feet wide, and no more, between the front or northern boundary line of block No. 35, and the southern boundary line of lot No. 145, and 182; and the direct continuation of said Water street westwardly shall be throughout its whole extent, and forever remain, 60 feet wide, and no more. Conway and Ashley streets shall be and forever remain as represented upon said map, throughout their whole extent, sixty feet wide, and no more, and all alleys represented upon said map, as running through the center or middle of each square, shall respectively be and forever remain twenty feet wide, and no more, throughout their whole extent. Therefore, be it known by these presents, that pursuant thereto, as well as in consideration of one dollar paid unto the said Roswell Beebe and Clarissa Elliott, his wife, the receipt whereof they do hereby acknowledge at and before the ensealing and delivery of these presents, by [to] the said mayor and aldermen of the said city of Little Rock, the said Beebe and wife do hereby remise, release, quitclaim and set over unto the mayor and aldermen aforesaid, and unto their lawful successors in office, in trust for the sole and only uses and purposes as herein mentioned and expressed, subject, however, to such stipulations, conditions, restrictions, aud limitations as are here provided for, all and every of our, and each of our, right, title, interest, claim and demand which we or either of us may, might, or shall have acquired by virtue of the issue of the patents as aforesaid in and to the several parcels of land embraced by and included within the limits of the said several streets and alleys, as well as all and every the rights, privileges, benefits and advantages of every kind appertaining

and incidental thereto, and relating to the said streets and alleys, or any part thereof, which may be comprised in the limits of the said streets and alleys hereby relinquished for public purposes; to be held by them for the free use, benefit and advantage of the city of Little Rock, the citizens thereof, and the public generally, so long and no longer than the same shall remain free and unobstructed public highways, as hereby contemplated, and as the same shall not be used or appropriated for any other or further use or purpose whatsoever. The same to be subject, nevertheless, at all times to such needful ordinances, rules and regulations as may, from time to time, be deemed necessary and proper to be made by the said mayor and aldermen and their lawful successors in office for the gradation, use, public advantage, good government, well-being and police of the same. But the same [this bill of assurances] shall, when taken and recorded in the office of the recorder in and for the county and state aforesaid, be considered by all the parties, as expressed or implied herein, as acquitting and forever discharging the said Beebe from any other or further obligation to make any other relinquishment or writing of any other name or nature to the said mayor and aldermen, or to their successors in office, under and by virtue of said covenant, as first aforesaid, or by any other means, in relation to any of the said streets, alleys, or privileges thereunto belonging, etc." Filed with this bill of assurances there was a map of the platted ground, forming the main three or four blocks south of the river and two or three blocks along the west line of the Quapaw line. Another plat or map covering the same ground as the first partial map, and more of the city, was filed on the 29th February, 1840.

It is manifest from the very language of this bill of assurances or dedication deed that the maker of it held himself bound to make it by the terms of his "covenant," and since this dedication consists entirely in dedicating the streets and alleys of the city to the public use, and does not purport to give or grant to the state, the county or any private individual, leaving that part of his covenant to be complied with, as provided in the same.

The meaning of the "covenant," as regards private per-

sons, is expressed in its first few lines, making use of the words
"lot" and "lots," while no such words are used to designate the
ground, in connection with the mention of the city as one of the
beneficiaries. The reason for that is obvious. In regard to pri-
vate individuals and such other beneficiaries as could only hold
"lots," it was necessary to use this word of general description
of a class of real property in order to emphasize the idea that
this class of claimants would have to show a claim of title to
such from the "original proprietors" elsewhere set forth in the
"covenant," whereas the streets had already, to-wit, seventeen
years before, been dedicated to the city by a bill of assurances
or dedication deed, then on record in the recorder's office
of Pulaski county, and had been for years. In this ded-
ication deed, Beebe, like a prudent man as he was, stip-
ulated that his deed should be held as a quitclaim to him
and release of all obligation on his part to further comply with
the obligation imposed by his covenant. He sought to empha-
size the idea that this dedication of the streets was a full com-
pliance with his covenant obligations to the city in that behalf.
Taking his bill of assurances in connection with the "covenant,"
it is impossible, it seems to us, to draw any other reasonable con-
clusion than that he regarded his covenant as covering the
case of the city in its ownership of the streets, as well as that
of the state, county and private persons in their ownership of
lots—the only description by which they can or do ordinarily
own city real estate; and we so hold.

If the "covenant" was binding upon Beebe at all as re-
spects the city and its streets, it bound him to relinquish his
fee in the land occupied by the streets as laid off and indi-
cated in the dedication of the "original proprietors." He un-
dertook, by his said dedication, to perform his covenant obli-
gations in this regard, but, instead of making a quitclaim of
the title he had acquired by his patent to the ground covered
by the streets, he made a dedication deed or bill of assurances.
This might have been accepted as a formal compliance with his
covenant, had he simply duplicated the bill of assurances of
the "original proprietors," for the prime object of the "cove-
nant" according to its very terms, was to confer upon the

covenantees the legál title to the ground which each one of them, respectively, had lawfully acquired from the "original proprietors," and in so far his bill of assurances is all that may have been required of him; but when he left off some of the ground which constituted one of the streets and part of another in the dedication deed and map of the "original proprietors," and thereby reserved that much to himself, in · so far he failed to comply with his covenant obligation. We are inclined to think that he was of the opinion then that the city council, in accepting his dedication, assented to this reservation, and could lawfully bind the city by such assent, and that therefore the same was a valid reservation to himself. This is the theory of the plaintiff's heirs, as contended for in this suit. In this there is no certain ground for impugning of motives, and this view of it leads us to assume the correctness of the proposition of plaintiff's counsel in their argument on the motion for a new hearing, to-wit: "It is but fair to say for Mr. Beebe that neither this record nor any. other record shows that either he or his heirs ever sought to disclaim his covenant, or ever failed to comply strictly with its terms, except in so far as they were altered by consent of the parties interested."

The only case in which this "covenant" has been interposed as a defense in a suit by Beebe or his heirs, based on his patent, is the case of *Skipwith* v. *Martin*, 50 Ark. 141, in which Martin represented the heirs of Beebe, and Skipwith was the grantee of Pulaski county, one of the beneficiaries in the "covenant." The suit was by Martin and against Skipwith. Judgment in the circuit court for Martin, and Skipwith appealed to this court. Skipwith for defense relied on the superior equities of his vendor—the county—growing out of the covenant obligation of Beebe to it, and adverse possession, and his defense was sustained on both grounds. As to his equities, the court said: "Coming down to the year 1839, our next inquiry is, whether Beebe, when he obtained his patent, was bound to make a deed to Pulaski county for the lots in controversy. This must be determined exclusively by his covenant. Since we have determined that the county had a good

conveyance from the original proprietors [their said bill of as-
surances], the county seems to have been within the letter of
Beebe's covenant,  If  he  had  refused to make a deed on de-
mand, he would have been compelled to execute it on a bill for
specific performance.  If he would have been compelled to
make it then, it is difficult to see why his heirs should not be
required to make it now.  It would hardly be claimed that the
right had been lost by the lapse of time.  We have never un-
derstood that a vendee in possession, who was entitled to a
deed, could ever lose his right thereto by efflux of time.  If
Beebe was bound to make a deed, what kind of a deed was he
to make?  In view of the emphasis and reiteration in his
covenant on this point, it would be unpardonable to raise a dis-
pute as to the character of this deed.  It was to be a quitclaim
deed.  There can be as little controversy as to the effect of such
a deed.  Since he himself had obtained from the government,
by his patent, a perfect title, as all concede, his quitclaim deed
then, and that of his heirs and privies now, would pass an in-
defeasible title."

Our conclusion from what has been shown is that the
covenant binds the covenantor to quitclaim his after-acquired
legal title to the covenantees respectively, and that the city of
Little Rock is one of the beneficiaries in the covenant.

It may be of interest to call attention to the history of
these land entries, as detailed by the Supreme Court of the
United States, notably in the case of *Cunningham* v. *Beebe*, 14
How. 377, in which the ancestor—the said Roswell Beebe—of
the plaintiffs was a party; Ashley having become interested
with him after the entries were made.  The "original proprie-
tors," that is, William Russell and others, in their bill of as-
surances to the city of Little Rock, made November 20, 1821,
and heretofore referred to, claimed to be the owners of the frac-
tional northwest quarter of section 3, and fractional section 2,
(that is, all those portions of the same south of the river, in-
cluding the ground involved herein), and their accompanying
map of the future city covered these tracts, and, as stated in
their bill of assurances, covered also additional lands to which
they laid no claim.  Among these additional tracts was the

southeast quarter of section 3, which comprises the very heart of the city.   The patent exhibited with plaintiff's complaint calls for said fractional south part of northwest quarter of section 3 and the fractional northwest quarter of section 2, all south of the river, and bordering on it, and also including the parcels of ground in controversy in this suit.

On the same day, and with the same kind of "floats" issued under the act of congress of 1830 and supplemental act of 1834, Beebe entered, or caused to be entered, the tracts containing the lands in controversy and the said southeast quarter of section 3, and received his patent for each bearing date of that day.

One Matthew Cunningham, claiming pre-emption rights to enter this quarter section by reason of occupation and cultivation prior to Beebe's entry, filed his bill in the Pulaski chancery court, attacking the validity of Beebe's patent and entry in this: that it was made on land subject at the time to plaintiff's pre-emption rights by reason of his prior occupation and improvement.   The supreme court of the United States reversed the decree of this court, which was an affirmance of the decree of said chancery court on appeal, and held the entry and patent of Beebe of said quarter section void as against Cunningham, in so far as it affected the 80 acres occupied and improved by him.   It was sought to be shown by the defendants in that suit that the land officers of the interior department had suffered the entry to be made, and advised the issuance of the patent, because the law and the rules and instructions of the department had been sufficiently complied with by Beebe's covenant to quitclaim to pre-emption claimants his legal title on the emanation of his patent; but the court held that the occupiers on this quarter section were not included within the terms of the covenant, and decree was for Cunningham as stated.   In determining the matter it became necessary for the court to state the circumstances under and purpose for which the "covenant," as applied to the land now in question, came to be made by Beebe. And from this we gather that, upon this covenant being made and recorded, the land department officers deemed that the

occupiers of these lands were sufficiently protected in their pre-emption rights by this obligation to confer upon the applicants the benefit of the entry and patent. Otherwise, it is manifest that there would not have been even an excuse to permit the entry, because otherwise the location of these floats on lands occupied and improved by others was prohibited by law. The covenantees—those claiming and showing title under the "original proprietors"—were necessarily those who had settled upon the city lots, as the same had been laid off and established by these "original proprietors" in their dedication deed and plat of November 20, 1821, and these were named in the "covenant," while those having claims upon the southeast quarter were not named nor referred to in the "covenant," and of course were not protected thereby. The language of the United States Supreme Court on the subject is as follows, to-wit:

"On the 6th of July, 1838, an instrument, under seal [the covenant], was entered into between Roswell Beebe, to whom the patents were issued [both the patents referred to], of the one part, and the mayor and aldermen of the city of Little Rock, in behalf of said city, as well as in behalf of the state of Arkansas, and also in behalf of any person or persons who may have in his own right a proper and regular chain of conveyance or conveyances of any town lot or lots situated in the first original town, now city, of Little Rock, derived from, by, or under, any one or more of the original owners and proprietors of the town, as represented upon the first original plan as then surveyed and laid off into town lots, of the other part, witnesseth, that whereas the said Roswell Beebe has caused to be located and entered with pre-emption floating claims, at the land office at Little Rock, and upon which the city, south of the Arkansas river, and west of the Quapaw line, is now built, the following described tracts or parcels of land, to-wit: the northeast fractional quarter of fractional section three, and the west fractional part of the northwest and southwest fractional quarters of fractional section two, all in township one, north of the base line of range twelve west, etc. And in all cases where purchases of lots had been made in the above tracts, Beebe bound himself to release to the purchaser.

"This arrangement [the covenant] induced the land officers to permit the entries to be made, as well on the southeast quarter in controversy, as on the tracts above described. And it was considered at the General Land Office as a sufficient compliance with the circular of that office, dated the 11th of October, 1837. The patents on this view were issued to Beebe; and on the 11th of January 1842, Beebe conveyed one half of the southeast quarter in controversy to Ashley.

"However satisfactory the agreement of Beebe may have been to claimants of lots on the tracts specified in his agreement [covenant], as it did not embrace the land claimed by the complainant [Cunningham], it was not designed for his benefit. And it is unaccountable that the land officers at Little Rock, and at Washington, should have considered the arrangement as a compliance with the regulations which prohibited the entry of floats upon improved or occupied land."

With this reference, the decision in that case will be understood in its application to the present case, keeping in mind, however, that a reading of the entire opinion gives the best idea of it.

The case of *Russell* v. *Ashley*, Hempstead, page 546, is another case wherein the entry and patent of Ashley (those which are involved in this suit) were attacked as invalid, on account of the manner of making the one and procuring the other. That case but adds to the history of these land transactions. Suffice it to say that the entry and patent were held void.

Some three or four years after making his bill of assurances, after some negotiations, the exact nature of which we have no means of ascertaining, Beebe & Ashley (the latter having purchased an interest in the meantime) on the one part, and the mayor of the city on the other part, made mutual deeds in exchange of certain real estate. In this transaction Beebe and Ashley conveyed to the city the four blocks constituting the present Mt. Holly Cemetery; another lot for a powder-house lot, near the present city park, and the two short streets just east and west of the State House, named Conway and Ashley streets, and took in exchange by conveyance of the mayor two

blocks, one now occupied by Peabody High School, and another in the same neighborhood occupied now by private residence, and the end of Center street, which at that time extended through the State House block. As a response to a further condition of the deed to the city, the mayor's deed attempted to engage the city to ratify the former acceptance of the city council of Beebe's dedication deed, or something to that effect. And this, it is contended, is a part of the consideration inuring to Beebe and Ashley in this exchange of property. We have no way of ascertaining just what were the stipulations of this trade which the city council had under consideration when it accepted the proposition (if it ever did so.) All we have on that subject is that, on the presentation of the report of the committee having that matter in charge, on motion the same was laid on the table; and further that Mr. Beebe, in his own testimony in another case brought forward in this, stated that, so far as concerns the giving of the short streets east and west of the state house, he made them a gift to get control of the extension of Center street through the state house block, so that he might convey the same to the state, so that it could have a whole solid block for the purpose of a state house; and that, as for North street, it was not his intention to deprive the city of that street, but, because of its rugged character, it deemed it impracticable to make a street there, and he therefore included it in adjoining lots or blocks, or words to that effect. But the mayor of the city, nor the city council, nor both acting together, can give away or exchange the streets of the city, and in all attempts to do so, with or without a consideration, not authorized by law, they act *ultra vires*, even although the city has enjoyed the benefit and retains the consideration therefor, where the same cannot in the nature of things be restored. *Newport* v. *Railway Company*, 58 Ark. 270 and authorities therein cited.

Besides, if the acceptance of Beebe's dedication, with the grounds in controversy excepted, amounted to a valid reservation of Beebe and the city council to himself, then it is strange that this same acceptance and cession by the city should afterwards be so far held for naught as that it should require a con-

firmation, and that act of confirmation, the act of the mayor, should be claimed as a part of the consideration in the mutual deeds inuring to Beebe and his grantee, Ashley. But this by way of suggestion only, since a consideration cannot make an *ultra vires* contract good and binding upon a municipal corporation. As to power of municipal council to alienate property dedicated to the public use, see 2 Dillon on Municipal Corporations, § 650, *et seq.*, and numerous cases cited by appellee's counsel.

The second question raised (and we think that is the real question in this connection) is, did the city authorities (if in fact they did so) have the right or power to deprive the city of North street and the river marginal part of Water street, as dedicated to the city for public use, by accepting Beebe's bill of assurances and accompanying plat, which left out this street and part of street, thereby reserving the same to him? Taking up plaintiff's other contentions in the order of their numbering in their brief, they say first: *"By accepting the dedication from Beebe in 1839, as evidenced by his plat and bill of assurances, the city did not release any part of any street to Beebe, because the ground retained by him was not part of any street."* As Beebe's bill of assurances was professedly in furtherance of his "covenant," by which he obligated himself to quitclaim his legal title, when acquired, to the city and others, referred to therein, claiming under the original proprietors, the duty of Beebe was to quitclaim strictly according to the terms of his covenant and the descriptions given in the bill of assurances and plat attached of the original proprietors. As equity considers as done that which ought to have been done, the original proprietors, in so far as the right of these covenantees are concerned, were the real owners of the ground which ought to have been included in such quitclaim deed. For instance, the ground here involved, North street, and the river margin of Water street, were in equity the property of the city for the use of the public, and not merely for its inhabitants or itself. Therefore, if the city officers had power to do such a thing, by accepting Beebe's dedication deed with all its conditions, they gave him North street and the river margin of Water street, and that,

too, without consideration, if that makes any difference. Whatever absolute or qualified right a city has to dispose of other classes of real estate held by it, it is now too well settled to require extended argument that a city has no power to sell or give away its streets, or any part thereof, without consent of abutting owners and legislative authority, and perhaps the consent of others directly interested.

We do not assent to that proposition, either as to its statement or conclusion. The bill of assurances and plat—that is, the dedication—of the original proprietors, being for the benefit of the city, was, under the common-law rule, presumptively accepted by the city authorities. But we do not need to base an opinion upon this presumption, since from the time Little Rock became a city until Beebe's entry the record shows that the city council had taken sundry steps looking toward the opening and use of the streets of which the pieces of ground in controversy form parts—enough, certainly, to show the real intention of the municipal authorities in relation thereto, and that intention amounts to a sufficient acceptance under the circumstances, and all parties seemed so to have viewed the matter in this light at the time. For several years from 1821, when the original proprietors made their dedication to the prospective city, Little Rock was a village or unincorporated town, and, of course, no official records were kept showing an intention to accept the dedication. It was incorporated as a town in 1825, and remained such until 1832, when it became a city. It could not be expected that the town council proceedings would be kept to any great extent in those primitive days. After it became a city, before Beebe's entry, the various acts of the city council plainly show an acceptance under the laws then existing.

Plaintiffs contended that Russell and others' dedication in 1821 was a nullity, as they had no title to the land, and cited *Moore* v. *Little Rock*, 42 Ark. 66, 68, and Elliott, Roads & Streets, p. 105, in support of that position. That, as we have, in effect, said, is not a question for the plaintiffs to raise. By their ancestor's and grantor's covenant, they have recognized the title of Russell *et al.* (the original proprietors) to the ex-

tent of endeavoring to confirm it, so far as it concerns the defendants. It is readily conceded that one without title cannot confer title upon a city by a deed of dedication, any more than he can by a deed of sale, but in the one case as in the other he confers all the title he has, and all that may thereafter accrue to him. For this reason the authorities cited are not applicable, and for the further reason that Russell *et al.* do not stand in the attitude of persons without title.

Again, it is contended by plaintiffs that "when it is sought to establish the devestiture of the citizen's landed property in favor of the public, the evidence of dedication ought to be so cogent, persuasive, and full as to leave no doubt of the existence of the owner's intent and consent." Is there any doubt that Russell *et al.* made the dedication, and is there any that Beebe attempted to release to the city the property dedicated to it by them in pursuance of his covenant? But it is contended that, under the covenant, the city should have demanded a deed of release from Beebe, as therein provided. Otherwise, it waived its rights to the protection therein provided for claimants. The city was not in the situation of a private donee or purchaser; it required no deed additional. Its deed of dedication was already on record, and all parties interested dealt in reference thereto; and Beebe is presumed to have done and intended to do what his covenant required him to do, the city having really nothing to do on her part to claim the fulfillment of the obligations of the covenant on Beebe's part. Besides, the question in the last clause is settled by *Skipwith* v. *Martin, supra.*

The second proposition is "*that, until the dedication was accepted, Beebe had the right to withdraw his dedication, or any part of it, and his bill of assurances made in 1839 was a withdrawal of the dedication of the property in suit.*" In answer to this proposition, we have only to say that, while assenting to the abstract proposition that before acceptance the dedicator ordinarily has the right to withdraw his dedication, yet such is not the case here. We do not treat Beebe as the dedicator, and his bill of assurances purporting to make him such, as we regard it, is valid in so far as it tends to evidence a compliance

with his covenant to release to those holding under the "original proprietors." These last were the real dedicators. The case of *Holly Grove* v. *Smith*, 63 Ark. 5, is not a case in point, for the principle therein established is: "There must be an intent to appropriate the land to public use, and if the intent of the owner is absent there is no dedication. Thus, the dedication of streets and alleys across a tract of land in a town is not established merely by proof of the making and recording of a map showing the streets and alleys, where the land remained enclosed and cultivated by the owners." In such case there is neither an acceptance, actual or constructive, nor a delivery of possession, actual or constructive. The dedication of the original proprietors in this case was something more.

The third proposition is that, "*even after formal acceptance of a dedication, the municipality may revoke it as far as unopened streets are concerned, if the owner assents.*" This presupposes a proposition on the part of the municipality for a revocation of the dedication, and the contention is that this can be done if the owner assents. Of course, this does not refer to Russell *et al.* as the owners, but to Beebe, and the meaning is that Beebe, as the dedicator, consenting to a revocation will make it valid. Beebe's title to the tract of land was on condition that he released so much of the tract to other claimants as might be shown to be the subject of the agreement. Certainly, his consent can have no effect in releasing him from the conditions under which he holds. Finally, there is no showing that the city has ever assented to a revocation of the dedication, even granting that it could do so after acceptance, for the argument under this heading is on the ground that both parties have assented to the revocation.

The fourth proposition is that, "*if lot owners were parties to the suit, none but abutters on the property in suit could be heard to complain.*" Beebe is not sought to be bound by an implied "covenant." He is not the grantor, except in the term of being a mere releasor. And to release he is bound by an express "covenant," executed by him for a valuable consideration, and under which vested rights have accrued, and parties protected by it have been caused to rest in security.

The fifth proposition is: "*The contract for the acceptance of Beebe's dedication has been fully executed by Beebe and the city, and the city still retains the consideration received by it under the contract. If its acts of acceptance were in fact* ultra vires, *it could not be heard to assert it.*" As an introduction to this proposition, plaintiff's counsel say: "We ought to have shortened the brief by resting' upon it [the proposition] alone." It may be considered as well settled that municipal authorities cannot sell the streets of the town or city dedicated to the public use, and the reason is, in such case the city or town is a mere trustee for the public, and a trustee cannot dispose of the property of the *cestui que trust,* except by special authority. In *Town of Searcy* v. *Yarnell,* 47 Ark. 269, this court said: "A municipal corporation has power to dispose of property held for general convenience, pleasure or profit." The property there involved was the town's interest in a railroad lying mostly without the corporate limits of the town, and constructed for the purpose of connecting the town with the Iron Mountain railroad, three or four miles away, and that for the general convenience, pleasure and profit of the inhabitants of the town. It was in no wise a necessity in or factor of the municipal government. Streets, however, are prime factors in municipal government, and no town could possibly exist without streets. In the ownership of its streets a town or city exercises the functions of a public corporation purely and solely, while in its ownership of property acquired by it for pleasure or profit it exercises the functions of a private corporation to a great extent, subject, of course, to express conditions upon which any piece of property may have been given or granted to it. Authorities involving the powers of private corporations are not applicable where streets are involved. If the city authorities cannot sell its streets, it follows logically that they cannot exchange them for other property, for there is no difference, on a question of *ultra vires,* between a money-consideration and a specific property consideration. Besides, as is contended by defendant's counsel, there is no evidence that the deed from the mayor of Little Rock to Beebe and Ashley, dated 28th February, 1843, was ever au-

thorized to be executed by the council, even if any authority to do so could have been conferred by an ordinance or otherwise.

But it is contended by plaintiffs' counsel that, if the city is allowed to disclaim the deed of its mayor, then a rescission of the mutual exchange evidenced by the deed should result, for they say the city should not be permitted to hold Conway and Ashley streets, therein for the first time dedicated to it, and retain also the controverted parts of Water and North streets, wife correctly understand them. Or, perhaps, they mean that, since the mutual deed of February 28, 1843, was given on the basis of Beebe's dedication, if the mutual deed cannot stand, a rescission should result as to all the property included in the former. This is not a bill to rescind, but a suit in ejectment, and it is impossible for us to determine the consideration for which any piece of property was granted on the one hand or released on the other; but, if such a question were before us, the evidence tends strongly to show that the prime consideration for which Beebe donated Conway and Ashley streets to the city was that he should be clothed with the disposition of Center street through the state house block, as it extended then, and thus be enabled to donate the solid block to the state for the purpose of erecting the capitol thereon, and that this was accomplished as he desired.

But it is contended that if the lease of the property for private use is void, as held in *Marine Ins. Co.* v. *Railway*, 41 Fed. Rep. 643, the plaintiffs as owners of the fee could maintain ejectment. This is a suit by persons claiming under the original owners of the property. The defense is that the ancestor of plaintiffs never in fact was the owner of this property, except for the specific purpose of transmission of title from the government; that Beebe's patent covering the land in controversy was only issued to him on condition that he should release to the city this very property, and thereby perfect its title, and the history of the case clearly sustains the defense, in our opinion. The plaintiffs, therefore, in the first place, are not the unconditional owners of the fee; and, in the next place, if their claim is in the nature of a reversion or forfeiture, it is not shown that plaintiffs are abutting owners, and abutters alone

are entitled where streets have been abandoned. The discussion under this head naturally gives rise to the discussion of the case of a city's lease of property for private use, as in the case at bar. In *Marine Ins. Co.* v. *Railway Co.*, *supra*, Judge Caldwell held, in effect, that a lease by the city authorities of a portion of a street was null and void, and that one permitting a nuisance on the ground so leased could not defend on the plea of his lease against a suit for damages to one of the general public growing out of the nuisance. When set up as a defense in such a case, such a lease may well be held to be null and void; that is to say, it is null and void as to the general public, but not to every special and adverse claimant. It is the duty of a city to open and keep in repair its streets, and it may be compelled to do so by a proper proceeding at the instance of a proper party; and a city cannot divert the grounds given for streets to other uses, but, if it does, its unlawful or negligent acts cannot divest the *cestui que trust*—the public—of title in the streets. To rent or lease a piece of property is but to assert an ownership and control of it, and is never considered as an abandonment. An improper use of property is not a forfeiture or abandonment of it. The only illustration of this principle which readily occurs to our minds is the case of a widow holding a homestead. If she sells outright, she abandons. If, however, she rents or leases for a time, and not for her life, she not only is held as not intending to abandon, but this is regarded as evidence of the opposite intention.

As the city has her own time, unless otherwise compelled, to open her streets, it would be impossible, in a proceeding like this, to determine anything as to its duties in the premises; but, as it cannot do by indirection what it cannot do by direct act, it cannot accomplish by its negligence that which it cannot accomplish by its affirmative wrongful act.

What has been already said virtually disposes of the question of the city's abandonment, as it does of the city's alleged laches in respect to the opening and improvement of the streets. The cases in which private corporations are said to have abandoned rights of way and other grants for public use, or public use in part, do not furnish precedents for the case of

a municipal or public corporation. Since 1885, at least, the city authorities have been authorized by law to rent or lease portions of its streets for which it has no present use, or where it is impracticable or impossible to use them as as parts of streets. Second sub-division, section 5313 Sand. & H. Dig. "Where a city has accepted the dedication of a public street, subsequent continued possession by the dedicator will not be presumed adverse to the city nor to the city's right lost by delay for more than seven years in opening up the streets for public use, in the absence of proof of adverse possession." *Little Rock* v. *Wright*, 58 Ark. 142. In the same case it is held by this court that "it is within the province of the city council of Little Rock to determine when the streets in question should be opened"; citing Mansfield's Digest, § 737. In this case there is no proof of adverse possession on the part of the plaintiff.

There is an effort to show the assertion of an adverse claim by testimony as to the assessment and payment of taxes for a time. If defendant's contention be sound that the parcels of land in controversy were parts of streets, they were not subject to taxation, and the putting them on the tax books and paying the taxes as assessed by another than the city were perhaps of themselves nullities, and were evidence of neither possession nor, perhaps, even a notice of a claim of possession; nor was the act of the city in permitting another to pay such taxes, even with notice, an abandonment or waiver of rights, for, aside from what might be asserted as a general principle, the manner of the alleged assessment is not shown to be as explicit as common fairness demands, in order to bind parties who may have been misled as to what was intended by the assessment. If the alleged assessment and payment of taxes by plaintiffs is introduced to show a change of title, all that may be said is that without default, forfeiture, sale and notice of forfeiture as provided by law nothing can confer title upon the tax-payer. *Bagley* v. *Castile*, 42 Ark. 77.

The piece of ground between North street and the river dedicated to the city by the original proprietors, but withheld in a manner in Beebe's dedication, presents a little different

phase of the case, although the question as to it in a general way may be considered as settled by what has been said in regard to Water street. What is designated on the plat of the original proprietors as half block 344, describing part of a block south of North street, was thrown in with that part of North street, and the river front north of it, and all described by Beebe in his dedication map as block No. 185, thus obliterating North street, taking from the city the river front north of it, and giving the whole to Beebe. The proof adduced plainly shows what was originally understood by all parties as block No. 344, and that North street had a well understood place, for long before Beebe had anything to do with these lands Ashley had purchased that half block from Russell, one of the original proprietors, claiming to own it individually. It appears to have been subsequently reconveyed to Russell by Ashley under the same description. Indeed, Beebe, as a witness in another case, explains that he did not obliterate North street for the purpose of securing the ground to himself, as charged against him, but because of the impracticability of making the rugged ground into a street. Without going into a discussion of this matter, our opinion is that, the river front at this point, having been made a part of North street, and as such dedicated by the original proprietors to the city as a street, the city could not be divested of it by any act of Beebe for the reasons heretofore given, as applicable to both streets.

There is this difference, perhaps, between North street and Water street, or the parts thereof involved in this litigation: In the case of the former the rents and leases of the city extended further back than in the case of the latter; and in the case of the latter the proof tends to show that at some points, if not substantially at all points, the highwater mark of the river extends to the street, treating it as only 60 feet wide, as designated on Beebe's plat, thus leaving no slope or river front.

This disposes of all the questions raised which we deem it necessary to dispose of.

Upon the whole case, we are of the opinion that the cov-

nant of Beebe covered the case of the city in its ownership of the streets included and laid off in the bill of assurances and plat therewith filed by the "original proprietors;" that there was an acceptance of that dedication by the city; that the city could not be deprived of the ownership and possession by its mayor or others pretending to act for it; that Beebe and his heirs and assigns were and are bound by the terms of his covenant, one obligation of which is that he should quitclaim the ground occupied by the streets laid off and dedicated by the "original proprietors," and that the parcels of ground in controversy are parts of Water and North streets respectively, and that the same are still streets of the city of Little Rock as originally laid off; and that in so adjudging, in effect, there was no error in the judgment of the circuit court.

Affirmed.

BATTLE, J., dissents.

RIDDICK, J., dissenting as to North street.