MARY O'LEARY, *Appellee,* v. THE METROPOLITAN STREET RAILWAY COMPANY, *Appellant.*

No. 17,356.

SYLLABUS BY THE COURT.

1. STREET RAILWAY—*Use of Street under Color of Ordinances— Estoppel.* Under the circumstances stated in the opinion, it is held that the city of Kansas City should be estopped from now questioning the legality of certain completed changes in one of its streets made by the street railway company under color of ordinances of the city, to accommodate its railway.

2. —— *Damages to Abutting Property Owner.* In such a case the street changes, although not warranted by the ordinances,

are to be considered as having been lawfully made, the city having had power in the first instance to authorize them, and an abutting property owner should not be allowed damages for resulting injury to his property on the theory that the work was unlawful and created a nuisance.

Appeal from Wyandotte court of common pleas. Opinion filed May 11, 1912. Reversed.

O. L. Miller, and C. A. Miller, for the appellant.
James F. Getty, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The plaintiff sued the defendant for damages to her property resulting from changes in the street made by the defendant to accommodate its railway. The plaintiff recovered and the defendant appeals.

Street traffic on James street, in Kansas City, is carried over Pacific avenue on a viaduct reached from the north by an approach. The defendant's rights originated in two ordinances numbered 5634 and 6102, passed in September, 1903, and March, 1905, respectively, and which read as follows:

"Section 1. . . . There is hereby granted unto the Metropolitan Street Railway Company, its successors and assigns, the right and privilege to cross over James Street upon the James Street wagon viaduct in Kansas City, Kansas, to the Kansas and Missouri State Line; and the further right, privilege and authority is hereby given to build, construct and operate a double track street railway thereon. . . .

"Section 2. . . . The said grantee, its successors and assigns, shall, at their own expense . . . complete the strengthening and reconstruction of said James Street viaduct by placing additional or stronger columns thereunder, making said structure safe and secure for carrying cars of the grantee and the traveling public and shall widen said viaduct to a width of not less than twenty-six (26) feet. . . ." (No. 5634.)

"Sec. 1. That the Metropolitan Street Railway Company . . . is hereby given the right, power and au-

thority to construct a double track street railway beginning at or near a point in the center line of Central Avenue on James Street connecting with the line of said Company as now located and operated on James Street; thence south on the surface of James Street to the south line of Bunker Avenue, thence south on an approach to a viaduct to a point approximately sixteen (16) feet above the surface of the south line of Pacific Avenue, thence south on a private elevated structure to the State Line between the states of Kansas and Missouri." (No. 6102.)

If the approach were to begin at grade at Bunker avenue it would of course obstruct travel as far north as it reached. Consequently the grade of the entire street was raised for some distance, and then returned to the established level and the rise of the approach was made to begin some 82 feet south of Bunker avenue, at the point where the old approach commenced. In front of the plaintiff's property the surface of the street was raised 17 inches at the north line of the lot and 12 inches at the south line. James street is 80 feet wide. Before the work complained of was done the space for travel between the old approach and the street curb was 20 feet. The space between the curb and the plaintiff's property line was ten feet, six feet of which was occupied by a sidewalk and four feet of which, next to the curb, was vacant. When the approach was reconstructed it was widened to 40 feet, and consequently the roadway on each side was narrowed. To make room for ordinary traffic the curbing was moved in three feet, making the roadway in front of the plaintiff's property 13 feet wide and the space between the curbing and the property line 7 feet. A new sidewalk was laid filling this space.

In her petition the plaintiff claimed damages because the grade of the street was raised, because the street was narrowed, thereby impeding free ingress and egress, and because the space between the curbing and the property line was narrowed. The answer pleaded the ordinances referred to and alleged that the new

O'Leary v. Street Railway Co.

structure in James street was built with the consent of the mayor and councilmen of the city and under the direction of the city engineer; that the plans and specifications for the new structure were prepared by the defendant and were submitted to the mayor and councilmen of the city and the city engineer, all of whom approved the same, and that the structure was built in accordance with such plans and specifications; that the change of grade was made with the knowledge and consent of the mayor and councilmen of the city and under the direction of the city engineer; that the change of grade, the resetting of the curb, and the relaying of the sidewalk in fact improved the street, left it in better condition than before and benefited the plaintiff's property, all of which changes were made with the consent of the mayor and council of the city and of the city engineer.

There was evidence that elaborate plans and specifications showing every detail of the proposed work were prepared by the defendant and submitted to the city; that the plans were presented to the mayor and council in open session and shown to them in detail; that the city engineer indorsed his approval upon the plans, which offered the best practical way of doing the work; and that the work was done strictly according to the plans. A councilman who had continued in office until the time of the trial testified that he personally knew of the changes made in reconstructing the viaduct. The making of the proposed changes was also brought to the attention of the mayor and council by a written protest against them signed by property owners along the street. The presentation of the plans to the mayor and council was shown by oral testimony and no record of official action thereon was offered. Although the action was commenced in December, 1906, shortly after the work was completed, it was not tried until in January, 1910. Meanwhile the approach and viaduct as rebuilt were used by the defendant for the

tracks of the Metropolitan Street Railway system and, so far as the record shows, without any complaint or objection by the city. The city was made a defendant in the action. In its answer the city pleaded the enactment of ordinance No. 6102 and alleged that the structure of which the plaintiff complained was erected pursuant to its provisions.

The court instructed the jury that express authority for the changes complained of, either by ordinance or resolution, was necessary to make them lawful, excluded from the jury's consideration the subjects of assent and acquiescence on the part of the city and refused instructions permitting the inference of authority for the defendant's conduct from the facts stated.

It will be observed that the ordinances themselves contained no specifications concerning the width of the approach. While it is familiar law that grants of this character are construed strictly against the grantee, it is also well settled that they must be construed reasonably with reference to the subject matter and the purpose of the grant. (2 Elliott, Roads and Streets, 3d ed., § 1052.) Under the first ordinance the old wagon viaduct was to be widened until it should be not less than twenty-six feet in width. No maximum width was prescribed. If anything beyond that width were reasonably necessary to accomplish the desired ends it certainly was not prohibited, and in any event it was indispensable that the approach be widened. Under the second ordinance the approach was left to connect with the old wagon viaduct and with the private elevated structure on which the railway tracks were to be carried. Evidently a widened approach was still contemplated and whatever was reasonably necessary or proper to make the grant effective was implied. Thus in the case of *Prince v. Crocker,* 166 Mass. 347, 44 N. E. 446, authority to build a subway in Boston impliedly authorized an entry upon the Boston Public Garden to make suitable connection with surface tracks, and im-

O'Leary v. Street Railway Co.

pliedly authorized the erection on the Public Garden of such a structure as might be necessary for subway purposes.

The plan which the defendant adopted for the work was, in the opinion of the city engineer, the best practicable for the purpose and his judgment was not questioned at the trial. To build an approach of the proposed width it appeared to be necessary to include within the way traveled by vehicles a portion of the unused space between the curb and the property line. The defendant interpreted the ordinance, presented its interpretation to the city, obtained the approval of the city engineer, and received no intimation of any disapproval by the mayor and council. The defendant then completed the work. Up to the present time the defendant has received no suggestion from the city that a nuisance was created in the street, but, on the other hand, the city by its answer in the case justified the approach as having been erected under one of its own ordinances. The city had power to authorize all that the defendant did. It might itself have changed the grade, removed the curbing and widened and rebuilt the sidewalk, or it might have required the defendant to make such changes as conditions of the street railway license. In order that street changes of this character may be legal they should have the sanction of an ordinance or resolution; but it does not follow that a city may in every case deny legality because the prescribed procedure has not been observed. On the other hand, in cases like the present one, the city should not be allowed to assail the conduct of the defendant as unauthorized.

"It is a rule that obstructions of this kind acquire no legality from the fact that they are put in place and operated without interference, and that mere time does not cure their illegal character; but in the case of a quasi public institution, like a railroad or street railroad, there are some exceptions to this rule. A municipal corporation should not be permitted to stand by

and see large amounts of money invested in enterprises of this sort by persons who act under the mistaken view that they have legal authority. In this case the appellant had authority by ordinance to lay down a street railroad upon a number of streets; it mistook its rights and placed a part of its track in a place not designated in the ordinance. Technically, it had no right to put its track where it did, but the complaint shows that the municipal officers, from the mayor down, and including the superintendent of streets, knew that the track was being laid on Division street, and no objection was made, and the superintendent of streets himself directed the method of laying the track upon that street. Subsequently the road was put in operation, and continued to be used for upwards of two years, during which time the corporation made no objection, and from year to year levied and collected taxes upon this very property, and up to this time, so far as the complaint shows, no objection has been made to the operation of a street railroad upon Division street. The only interference which has been undertaken is not one for the purpose of clearing the street of an obstruction, but one to enable another street railroad company to lay down and maintain a track in the same place. . . . The principal point urged by respondent under this head is that the city charter provided that contracts should be made only by ordinance, and that, inasmuch as a street railroad franchise is in the nature of a contract, the right to maintain its track could arise in no other way than by express provision of an ordinance. Charter of 1886, § 85. But it is evident from the reading of that entire section that the contracts there intended are those which would bind the city to the payment of money. The general rule would, of course, be that franchise of this kind could not be acquired except by the action of the corporation, which must be taken by ordinance, but the statute in question does not prohibit the courts from declaring an estoppel against the city in other matters in the same manner that they would as against private persons." (*Spokane Street Ry. Co. v. Spokane Falls*, 6 Wash. 521, 523-525, 33 Pac. 1027.)

"While the statute must be followed in all essential particulars in order that the consent of the electors to the occupation of the streets of the city by a railway company shall be valid and beyond recall, it does not

follow that an irregular exercise of the power possessed by the electors is absolutely void and wholly without force. The manner in which the question of the consent of the electors of the city was submitted was clearly irregular, and the affirmative vote cast thereon just as clearly conferred no power upon the railway companies to use the streets of the city beyond the time when that right should be questioned by some proper authority. But we are not prepared to say that, where the companies acted in good faith and expended their money in the construction of lines under a supposed right to occupy the streets, and this right was not questioned until the bringing of the present action, they or those claiming under them should be ousted from the possession of such streets as are now occupied by their lines, and their property rendered worthless. Under the circumstances of this case, we do not think it would be a wholesome public policy to hold that, because of the irregularity which occurred in granting the right which the people had power to confer, such irregularity renders all proceedings under the vote void and of no effect." (*State v. Citizens Street R. Co.*, 80 Neb. 357, 360, 114 N. W. 429.)

"The only objection to the first ordinance is the fact that it received its first reading at a special meeting, notice of which, it is alleged, was not given to the absent members, and which was held pursuant to an ordinance relating to special meetings under which the council had acted for several years, but which, it is claimed, was never legally adopted. Conceding these irregularities to have existed, the city is not in position to assert them to the manifest injury of the plaintiff. It is estopped from doing so by the conduct of its council at the regular meeting, when the first ordinance was passed, all the aldermen being present; by the conduct of its mayor in indorsing his approval, thereby certifying under the sanction of his official oath that the ordinance was legally adopted; by the conduct of its committee in designating the location of the plaintiff's poles; and by the publication of the ordinance. That the plaintiff in good faith expended large sums of money, relying upon the validity of the ordinance, is undisputed. That the municipal authorities intended to consent to the construction of the plaintiff's line is established beyond the possibility of a doubt. The mayor and council were authorized to give the required

consent, they led the plaintiff to believe they had given it, and by every rule of right and justice they should not now be permitted to avoid the consequences of their action by asserting technical objections to the method of their procedure." (*Telephone Co. v. City of Mitchell,* 22 S. Dak. 191, 199, 116 N. W. 67.)

In such cases the estoppel is mutual between the city and its grantee.

"But it is also urged by counsel for appellant [the street railway company] that it had no grant or privilege or franchise from the city or county to operate its tracks upon the public streets, and has simply a license from the owners of the additions through which these streets ran. But it has continuously occupied these streets, since 1892, with its lines, and no objection has been made by the city or county authorities to such occupation, and it is in undisturbed use and occupation of these streets. The city could not object now." (*State, ex rel. Grinsfelder, v. Street Ry. Co.,* 19 Wash. 518, 531, 53 Pac. 719.)

Lapse of time may be sufficient to raise a presumption of acquiescence or of ratification.

"Where a street railway company in laying its track on a borough street has slightly deflected from the line for the track established by the borough and the borough has acquiesced in this location of the track for ten years it will be presumed to have ratified the deflected line, and if the railway company in reconstructing its track lays it upon the deflected line, the borough has no standing to object." (*Bridgewater Boro., Appellant, v. Traction Co.,* 214 Pa. St. 343, syl., 63 Atl. 796.)

But lapse of time is only one of the elements to be considered in determining whether or not the municipal corporation ought to be estopped.

"Whilst municipal corporations are not, as respects public rights within ordinary limitation statutes, still, the principle of an estoppel *in pais* is applicable in such cases, as this leaves the court to decide the question, not by mere lapse of time, but by all the circumstances of the case, and to hold the public estopped or not, as right and justice may require." (*C., R. I. & P. R. R. Co. v. City of Joliet,* 79 Ill. 25, syl. ¶ 9.)

This court on numerous occasions has recognized the applicability of the doctrine of estoppel to municipal corporations. (*Sleeper v. Bullen & Dustin, et al.,* 6 Kan. 300; *City of Belleville v. Hallowell,* 41 Kan. 192, 21 Pac. 105; *H. & S. Rld. Co. v. Comm'rs of Kingman Co.,* 48 Kan. 70, 28 Pac. 1078.)

Inaction, acquiescence, tacit consent, and the like, on the part of city officials can not be invoked to justify private invasions of public property or rights, and lapse of time can not bar remedies appropriate for the protection of public interests. Nor can estoppel be invoked in cases where the city was powerless, under the law, to do the disputed thing in the first instance. But no such questions are presented here. The grant of the defendant's license was made in the interest of the public welfare. The purpose was to meet the need of the traveling public for additional facilities in the way of street-car service and to adjust the street in such a way that old uses might be subserved while new possibilities of use were realized. Therefore in undertaking the street changes complained of the defendant acted in a certain sense for the city in the accomplishment of the desired public ends; and all the circumstances considered, the city ought to be precluded from questioning the defendant's interpretation of the scope of the ordinance under which the improvements were made.

Nothing that was said in the case of *Longnecker v. Railroad Co.,* 80 Kan. 413, 102 Pac. 492, conflicts with this doctrine. In that case the abutting property owner asked in advance for an injunction to prevent the laying of a street-car track contrary to the express provisions of a plain grant. In this case the plaintiff waited until the result of the work had taken permanent form under conditions which were the just equivalent of a warrant of authority from the city.

The jury should have been allowed to consider the evidence bearing upon the question of estoppel and should have been instructed that if they found the facts

to be as stated above, or otherwise sufficient to constitute estoppel, the street changes complained of were to be regarded as if lawfully made in regular manner under authority duly conferred, but that if they found otherwise such changes should be regarded as unauthorized and wrongful; and the rules relating to the right of an abutting property owner to recover damages applicable to each view should have been stated. The case having been submitted upon a wholly different theory, the judgment is reversed and the cause is remanded for a new trial.