## PROVO CITY et al. v. DENVER & R. G. W. R. CO. et al. (two cases).
### Nos. 3239, 3240.

Circuit Court of Appeals, Tenth Circuit.
July 25, 1946.
Writ of Certiorari Denied Oct. 28, 1946.
See 67 S.Ct. 124.

PHILLIPS, Circuit Judge, dissenting.

Willis W. Ritter, of Salt Lake City, Utah (George S. Ballif and I. E. Brockbank, both of Provo, Utah, on the brief), for appellants.

W. Q. Van Cott, of Salt Lake City, Utah (P. T. Farnsworth, Jr., and Grant H. Bagley, both of Salt Lake City, Utah, on the brief), for appellees.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

BRATTON, Circuit Judge.

Due in large measure to war conditions, the yard facilities of Denver & Rio Grande Western Railroad Company, in Provo, Utah, were found to be inadequate for the needs of the company. Two plans were considered for solving the problem. One was to enlarge the existing facilities within the city, and the other was to construct new facilities outside the city. The company, and the mayor and commissioners of the city, entered into negotiations, resulting in an oral agreement that an ordinance would be passed closing Ninth Street at the point where the existing tracks crossed it and that the facilities within the city would be enlarged. The ordinance was never introduced or passed. But relying upon the verbal agreement that it would be passed, the company barricaded the street and constructed the enlarged facilities. Citizens of Provo protested the closing of the street

and later urged that it be reopened. The city removed the barricade on one side of the tracks and began work to reopen the street for use as a public thoroughfare. The company filed proceedings to enjoin the city, the mayor, and the commissioners from proceeding further in that direction. Issues were joined, and the causes were tried to the court upon stipulated facts, documentary evidence, and oral testimony. Concluding that the defendants and all citizens and residents of Provo were estopped from alleging or contending that the street had not been closed, vacated, and abandoned as required by law, the court entered judgments enjoining the defendants from interfering with the barricades and from reopening the street. The defendants appealed.

■ The primary contention advanced for reversal of the judgments is that the City of Provo had power to vacate the street only by ordinance, and that in the absence of such an ordinance, the doctrine of equitable estoppel cannot be invoked to prevent the city from reopening the street as a public thoroughfare. Of course, the contention must be determined according to the law of Utah. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L. Ed. 1188, 114 A.L.R. 1487; Ruhlin v. New York Life Insurance Co., 304 U.S. 202, 58 S.Ct. 860, 82 L.Ed. 1290.

■ Section 15—8—8, Utah Code 1943, in presently material part, provides that boards of commissioners or councils of cities may vacate streets or parts thereof, by ordinance. The statute was considered in Tooele City v. Elkington, 100 Utah 485, 116 P.2d 406. There, a strip of land was shown on the official plat as an alley but it had never been opened to the public as a thoroughfare. Elkington and his predecessors in interest had for a long period of time kept it fenced to the exclusion of the public. The city council adopted a resolution authorizing the execution of a quit-claim deed to Elkington, and the conveyance was executed and delivered pursuant to the resolution. Thereafter, the city brought suit to quiet title to the strip. Pointing to the provision in the statute that streets or parts thereof may be vacated, by ordinance, the court said in sweeping language that the powers of municipal corporations are delegated; that municipal corporations may exercise only the powers granted to them; and that such powers can be exercised only in the manner prescribed. And the court further said that the community is interested in the vacating of streets; that the legislature had provided that they may be vacated by ordinance in order that those in interest may have notice of the acts of the commission and thus opportunity be afforded private property holders and the community to protect themselves against such actions. Emphasizing these considerations, the court held that the city was not estopped to assert that the strip constituted a public thoroughfare. The more recent case of Hall v. North Ogden City, Utah, 166 P.2d 221, 225, was an action to enjoin the city from opening up as streets certain tracts of land indicated as streets by the official plat of the townsite. It was argued that the city had lost whatever title it may have had to the streets which were never opened as public thoroughfares or had ceased to be used as streets. But the contention was rejected, and in upholding the right of the city to open the tracts as streets, the court said:

"The only way in which North Ogden could have lost title or be barred by estoppel and laches from asserting title, if at all, would be some acts which would either vest title in others or which would give others the right to preclude North Ogden from asserting its title. In view of the unequivocal language of the Townsite Act, title could not be acquired by individuals through adverse user. As stated in the case of Tooele City v. Elkington, 100 Utah 485, 116 P.2d 406, although a street or alley designated as such on the townsite plat has not been opened up, the officials of the municipality themselves could not convey the title without compliance with the statutes. It is necessary to find statutory authority for divesting the municipality or the public official holding title to the streets in trust for the town, of such title to the streets, in order for the appellants to prevail in this case. It is not claimed that any ordinance was adopted for vacating the streets in

question, nor that the inhabitants of North Ogden ever filed any petition to. vacate or alter any portion of the plat of North Ogden. The rule of estoppel could not apply against the town as to lands charged with a public trust, for the reasons hereinbefore indicated. Any abandonment or vacation of the land for street purposes, to discharge it of the public trust, would have to be in the manner provided by statute."

In the early case of Wall v. Salt Lake City, 50 Utah 593, 168 P. 766, it was held that in the peculiar circumstances presented the city was estopped to contend that the strip of land in controversy was part of a public street. But there the rights of the parties had been fixed before the statute, section 15—8—8, supra, was amended to provide that streets or parts thereof may be vacated, by ordinance; and disposition was made of the case without any reference to the statute. These three cases, considered in their composite effect, seem to make it clear that in Utah the principle of estoppel in pais is to be applied very narrowly to a city in respect of its right to reopen a street for use as a public thoroughfare and only in cases where the city acted within the ambit of its legal authority but in an irregular way; and that the principle does not have controlling application in a case of this kind where the mayor and city commissioners merely agreed verbally to pass an ordinance closing the street but never did even attempt to pass it, regular or irregular.

A further consideration supports the conclusion that the railroad company is not entitled to prevail by invoking the. equitable doctrine of estoppel against the city. The company knew that the law of the state provided in positive terms that passage of an ordinance was the sole and exclusive method by which the city had power to abandon or vacate the street as a public thoroughfare. It knew that under the rigid mandate of the statute, the city was stripped of any power whatever to effect an abandonment or vacating. of the street in any other manner. And it was in possession of all the material facts in respect of the passage of the ordinance. It knew that the ordinance had not been passed. Still, in. full possession of all the material facts, it barricaded the street and constructed the additional tracks, thus depriving the public of the use of the street as a public thoroughfare. In going forward without any ordinance having been introduced or passed, the company acted at its own peril and is not now in position to urge with success in a court of equity that the city be estopped and in that way completely wipe out the statute insofar as its efficacy in these cases is concerned. If that could be done once, it could by sufficient repetition become the general practice and the statute thus relegated to the position of a dead letter.

Finally, section 25—10—21, Utah Code 1943, provides in part that subject to the provisions of the chapter, the legal voters of any city or town may in the manner prescribed require any law or ordinance passed by the law-making body to be submitted to the voters before it shall take effect. If the commission had adopted an ordinance vacating the part of the street in question, the voters of the city would have had the right under this statute to cause the ordinance to be submitted to a vote of the people before it became effective and to defeat it if the requisite vote were cast against it. Cf. Keigley v. Bench, 97 Utah 69, 89 P.2d 480, 122 A.L.R. 756. But under the procedure adopted by the city commission in this instance the people were deprived of that right, without any warrant in law. It is suggested that the matter might have been submitted to a referendum, even without passage of an ordinance. But a critical reading of the statute lends no support to that contention. The statute is limited in scope and effect to the initiation of legislation and to the rejection of laws or ordinances passed by the law-making body. Here no law or ordinance was enacted. There was nothing to submit to the people for approval or rejection before it became effective, within the meaning of the statute. And certainly it was never contemplated that a city commission could by the procedure followed in this instance circumvent the statute and deprive the people of their right expressly granted by the statute to approve or reject the proposed abandonment of a portion of the street which was in active use as a public thoroughfare.

The judgments are severally reversed and the causes remanded with direction to dismiss the actions with prejudice.

PHILLIPS, Circuit Judge (dissenting).

The findings of the trial court are supported by substantial evidence and are not clearly erroneous and, therefore, are binding on this court. The findings and undisputed evidence reflect these facts: In 1942, the Denver and Rio Grande Western Railroad Company[1] entered into negotiations with the mayor and commissioners of Provo City respecting the building of new railroad yards and the closing of Ninth South and Fifth East Streets in Provo. The negotiations continued into 1943.

Throughout the years 1942 and 1943, Maurice Harding was mayor and J. P. McGuire and Joseph H. Swapp were the other two members of the city commission. In the fall of 1943, there was a municipal election to fill the office of mayor and the office of commissioner held by McGuire. Harding was reelected. McGuire failed of reelection, and Blake D. Palfreyman was elected in his place.

During 1942 and 1943, freight traffic handled by the Railroad Company in its freight yards in Provo increased to such an extent that extensive railroad yards had to be constructed. The agent of the Railroad Company at Provo explained the situation to the mayor and commissioners in July, 1942, and February, 1943. He advised the city officials that the Railroad Company could enlarge the existing yards within the corporate limits of Provo, but that it would require the closing of Ninth South Street and Fifth East Street; that as an alternative, the Railroad Company could build new yards outside of Provo. The mayor and commissioners, in order to increase tax receipts and business and employment within the city, urged the Railroad Company to enlarge the existing yards within the city limits.

At a meeting of the city commissioners, held on February 25, 1943, the mayor, the other commissioners, the city attorney, and representatives of the Railroad Company were present. The agent of the Railroad Company told the city officials that the project would cost over $100,000, and exhibited to them a map of the proposed enlargement of the yards showing Ninth South Street and Fifth East Street closed, and a cut-off street between Fifth East and Ninth South Streets. The agent of the Railroad Company again told the city officials that if the yards were extended within the city, such streets would have to be closed. Thereupon, the mayor and commissioners agreed to enact an ordinance closing the streets. A statement was given to the press. A news item in the Provo Daily Herald issue of February 25, 1943, a newspaper of general circulation in Provo, described the project, stated that it would be necessary to close Ninth South Street, and described the cut-off road between Ninth South and Fifth East Streets. The city officials and the Railroad Company representatives agreed that the Railroad Company attorney should prepare the necessary ordinance for the closing of the streets and send it to the city attorney of Provo. On March 9, 1943, the attorney for the Railroad Company forwarded a form of ordinance to the city attorney.

On February 27, 1943, a group of approximately 200 citizens of Provo protested the closing of Fifth East and Ninth South Streets.

The Railroad Company kept in touch with the mayor and repeatedly asked when the ordinance would be passed. The enlargement of the yards was imperative and the Railroad Company urged the city officials to proceed with the enactment of the ordinance in order that construction work could be commenced. On April 7, 1943, Mayor Harding told the Railroad Company agent at Provo that the ordinance would be passed, the streets closed, and that the Railroad Company could go ahead immediately with the construction of the yards without waiting for the enactment of the ordinance. On April 9, the Provo Daily Herald published an article that Ninth South Street was to be closed. The information did not come from the Railroad Company and must have come from Mayor Harding. The newspaper

---

[1] Hereinafter called the Railroad Company.

article stated, "Closing of Ninth South street . . will be ordered by the city commission in an ordinance to be adopted next week." It then quoted Mayor Harding as follows: "With numerous tracks to be constructed across the street, a dangerous hazard would result unless the road is closed." On April 7, the agent at Provo telephoned to the Railroad Company's representative at Salt Lake City that the work could commence at once. On the same date, the Railroad Company superintendent directed the Division Engineer to proceed with the work.

The Railroad Company relied on the promise of the mayor and city officials, and abandoned the alternative plan of building outside of Provo. Immediately after April 7, 1943, the Railroad Company secured an easement for and constructed, the cut-off road 41.25 feet wide and approximately 700 feet long from Fifth East to Ninth South Streets. The cut-off road was accepted as a public road and has been continually used as such and has been maintained by Provo. It is shown on the Provo map as a public street. The Railroad Company secured the land necessary for the new yards, and construction of the yards was commenced on April 11, 1943, and continued until the fall of 1943. The Ninth South Street crossing was barricaded and closed to travel in May, 1943. Eight new tracks were laid across Ninth South Street in June and July, 1943. The Railroad Company expended for the improvements $160,000. The city officials and the public knew of, and acquiesced in, the closing of the streets. The city officials made no objection to the closing of the streets during 1943 and 1944. No effort has ever been made to open Fifth East Street. In March, 1945, the city undertook to open that portion of Ninth South Street which had been closed.

The city cooperated with the Railroad Company in the construction of the yards. The city built new water pipelines along Ninth South Street. The city changed its plans because of the projected railroad yard enlargement and put in an additional 6-inch cast-iron pipeline so that the city would not later have to tunnel under the tracks. The additional pipeline was recommended by the city engineer to the mayor and commissioners in April, 1943. The engineer stated that the pipeline should be installed before the tracks were laid. The Railroad Company left the new tracks open until the city had finished its trench for the pipeline. At the request of the city, the Railroad Company did some of the city's work and was reimbursed for it.

The construction of the yards has resulted in an increase of tax revenue to Provo of approximately $2,400 per year.

The opening of Ninth South Street across the railroad yards and tracks would make it necessary for trains and cuts of cars being switched or stored to be divided at the crossing and would slow down the handling of trains and cars in the yards. It would reduce the usefulness and efficiency of the yards to the extent of 50 per cent, and greatly increase the cost of operating the yards. It would constitute a serious danger and hazard to the public traveling across such railroad yards and tracks. The city has never offered to reimburse the Railroad Company or place it in status quo for the losses and damages that would result from the reopening of Ninth South Street.

When the agreement was reached for the closing of the streets, two conditions were imposed by the city, one, that the cut-off road would be built, and two, that the Railroad Company would reimburse the city for the cost of moving certain water and light lines. The city has never moved such lines. The Railroad Company has repeatedly advised the city of its willingness to pay the cost thereof. No other conditions were imposed.

Judge Dillon, in his work on Municipal Corporations (3 Dillon, Mun. Corp., 5th Ed., § 1194) stated the doctrine of estoppel with respect to municipal corporations as follows:

"Upon consideration, it will perhaps appear that the following view is correct: Municipal corporations, as we have seen, are regarded as having, in some respects, a double character, one public, the other (by way of distinction) private. As re-

spects property not held for public use, or upon public trusts, and as respects contracts and rights of a private nature, there is no reason why such corporation should not fall within limitation statutes, and be affected by them unless excluded from them. For example, in an action on contract or for tort, a municipal corporation may plead or have pleaded against it the statute of limitations. But such a corporation does not own and cannot alien public streets or places, and no mere laches on its part or on that of its officers can defeat the right of the public thereto; yet there may grow up, in consequence, private rights of more persuasive force in the particular case than those of the public. It will perhaps be found, that cases sometimes arise of such a character that justice requires that an equitable estoppel shall be asserted even against the public, but if so, such cases will form a law unto themselves, and do not fall within the legal operation of limitation enactments. The author cannot assent to the doctrine that, as respects public rights, municipal corporations are impliedly within ordinary limitation statutes. It is unsafe to recognize such a principle. But there is no danger in recognizing the principle of an estoppel in pais as applicable to exceptional cases, since this leaves the courts to decide the question, not by the mere lapse of time, but upon all the circumstances of the case to hold the public estopped or not, as right and justice may require."

In Wall v. Salt Lake City, 50 Utah 593, 168 P. 766, 770, 771, the court expressly approved the doctrine as stated by Judge Dillon and applied it to the claim of a private person to a portion of a public street, against Salt Lake City. After quoting § 1194, supra, the court in its opinion said: "We are in accord with the law relating to this question as declared by Judge Dillon in the excerpt above quoted." It also quoted with approval the following excerpt from City of Sullivan v. Tichenor, 179 Ill. 97, 53 N.E. 561:

"A municipal corporation can no more profit by fraud upon property owners than an individual and may be estopped by conduct."

As to the acts necessary to create an estoppel it quoted from a note to § 1194, supra, as follows:

"The principle of estoppel in pais has been applied to exceptional cases where the elements calling for its exercise appear to have been an abandonment of the public use for the prescriptive period, inclosure and expensive improvements, such as large and costly buildings, or acts of the municipality inducing the abutter to believe that there is no longer any street, and the expenditure of money in reliance upon the acts of the municipality."

The court further said:

"We hold that this case falls within the exceptional class of cases referred to by Judge Dillon, and that it is the duty of the court to decide it as 'right and justice require.' It is our opinion that the city is estopped from claiming the premises in question as a public street."

It is my opinion that the Supreme Court of Utah in Tooele City v. Elkington, 100 Utah 485, 116 P.2d 406, and Hall v. North Ogden City, Utah, 166 P.2d 221, did not depart from the doctrine announced in the Wall case.

In the Elkington case, the court, after reciting the facts in the Wall case, said [100 Utah 485, 116 P.2d 410]:

"In the case at bar, the consideration given the city by Elkington was small, if anything; the deed was made in contravention of the statute; there is no evidence that the property has been assessed against the defendants or their predecessor in interest; the time element is short; and there was not a replatting or a change in the whole neighborhood to the benefit of all adjacent landowners.

"Balancing the justices of the cause, we find there is no ground for an estoppel in pais as against the city."

If the fact that an ordinance vacating the street had not been enacted was in itself a sufficient answer to Elkington's claim, why did the court refer to the Wall case, distinguish it on the facts, and expressly hold there was no ground for an estoppel in pais?

In the Hall case, Hall and others asserted claim to the streets by adverse possession. No claim of estoppel was asserted or decided. It was held that under the Territorial Townsite Act, under which the city claimed, the plaintiffs were prohibited from acquiring title by adverse use.

Here, the city officials promised to enact the necessary ordinance, and, because of the exigencies of the situation, advised the Railroad Company that it might proceed in advance of the actual enactment of the ordinance. The Railroad Company acted on the faith of that promise. It complied with the conditions imposed by the city. It acquired the right-of-way and constructed the cut-off street. The city accepted that street, and used and improved it. The city permitted the Railroad Company to close the portions of Ninth South Street and Fifth East Street where they were to be crossed by the new yards. The Railroad Company expended large sums of money in acquiring the right-of-way for the cut-off street and in constructing that street and the new yards. The city suffered the portions of Ninth South Street and Fifth East Street to remain closed until the yards were constructed. It cooperated with the Railroad Company in constructing the yards with respect to the laying of water mains in advance of construction. The city enjoys the increased taxes and other benefits which flow from the construction of the yards within the city limits. To now open Ninth South Street would materially decrease the efficiency of the yards and substantially increase the cost of operation thereof.

It seems to me that the instant case is one where right and justice require a holding that the city is estopped to reopen Ninth South Street across the yards at the ground level. Under an express limitation in the trial court's decree, the city is free to petition the Public Service Commission of Utah for a finding that public convenience and necessity require the establishment of a crossing above or under the yards of the Railroad Company at Ninth South Street and for an order for the establishment of such overpass or underpass.

I would affirm.