[L. A. No. 19546. In Bank. Nov: 10, 1947.]

COUNTY OF SAN DIEGO, Respondent, v. CALIFORNIA WATER AND TELEPHONE COMPANY (a Corporation), Appellant.

Claude N. Rosenberg, Bacigalupi, Elkus & Salinger and P. S. Thacher for Appellant.

James Don Keller, Thomas Whelan, District Attorneys, Frank T. Dunn, Assistant District Attorney, and Carroll H. Smith, Chief Trial Deputy District Attorney, for Respondent.

GIBSON, C. J.—Defendant, a public utility company, is engaged in the construction of a dam which, when completed and full, will flood a portion of a county highway. Plaintiff brought this action to enjoin the flooding. Defendant has appealed from an adverse judgment, contending, principally, that under the stipulated facts the county has waived damages

to its property and is estopped by its conduct to obtain the relief sought.

For a number of years the county has maintained a public highway which, approaching from the west, crosses Sweetwater River over the Sacatara Bridge and then, a short distance to the east, crosses Peterson Canyon Creek over another bridge. In 1931, the board of supervisors adopted a resolution to the effect that the Sacatara Bridge was unsafe and that if a proposed dam on the Sweetwater River was constructed, it would be necessary to change the location of the bridge, rendering it not advisable then to repair or rebuild it. Several years later, after the county had appropriated funds to construct a new bridge, the county surveyor and ex officio road commissioner wrote to defendant company stating that the county intended to make certain road improvements, including a new bridge over Sweetwater River and a reduction of the curvature. The letter stated that the county was applying to defendant for ''a temporary right of way'' across its property ''to serve until . . . it becomes necessary to build a permanent line higher up to follow the high water contour of the proposed new dam.'' The county forwarded with its letter a map showing both the temporary right of way and the proposed ''future permanent road,'' the latter located considerably to the north of the old route.

In the latter part of 1938, the company granted a ''temporary right of way'' over its land. This easement did not cover the area near the Sacatara Bridge but only a portion of the highway east of the Peterson Creek Bridge, and it was located almost exactly along the line of the original highway. The deed provided that the right of way should revert to the grantor company upon completion of the permanent highway or 90 days after notice to the county of the owner's intention to construct a dam on the Sweetwater River. It also provided that by acceptance of the easement the county agreed that the owner should not be liable to the county for ''any claim or damages of any kind or nature whatsoever arising out of or in any manner connected with the building of said dam and/or the inundation of the property hereinabove described.'' The deed was accepted by the county and ordered recorded.

Shortly thereafter the defendant company wrote the county that two plans for the proposed dam with different spillway elevations, one at 1,355 feet and the other at 1,375 feet, had been considered; that an additional 10-foot allowance should

be made for flood crests; that "there is no definite information as to the time when construction of either of these will begin"; and that the county should consider constructing its highway and bridge at an elevation of 1,400 feet, leaving room for any change in plans of the company.

Pursuant to a request by the county, the company tendered a second temporary easement containing identical provisions relating to reversion and waiver of damages. The record indicates that this was to be an extension of the temporary easement of 1938, covering approximately the area between the two bridges but located considerably to the north of the old road. With respect to this tendered easement, the board of supervisors was informed by a deputy district attorney that, although the original plan had been to construct the new bridge at an elevation of 1,365 feet, the county had been notified that the bridge should be built at the higher elevation of 1,400 feet; that the county road department believed the cost of building at that elevation would be prohibitive; and that in any event the tendered easement (containing the reversion and waiver provisions) should not be accepted in its present form. The company was notified that the easement was not accepted "in view of the provisions contained therein."

Plans for a new Sacatara Bridge at the old location were approved, and a particular design was adopted "because of the high salvage value of the superstructure in the event the . . . company elects to construct a dam. . . ." The bridge was finished in 1941.

Thereafter, a third easement, dated December 19, 1941, for a new westerly approach to the Sacatara Bridge was tendered by the company and accepted by the county. It apparently followed the old road to a point about 2,400 feet from the bridge and then continued to the bridge on a line more or less parallel to the old road but a few feet to the north thereof. This easement, unlike the one accepted in 1938, was not designated as "temporary," but it was made subject to reversion to the grantor in the event of six-months' nonuser or if the grantor "should at any time" construct a dam resulting in the flooding of any portion of the right of way. There was also a waiver of any claim for damages for the flooding of "said lands, or any portion thereof."

In 1943, the company requested that a certain part of a road connecting with the highway in question be altered

so that equipment to be used in the construction of a dam could be moved over it, and subsequently a letter was sent thanking the county for speedy action on the request.

The company began building its dam without instituting proceedings in eminent domain to condemn the road and bridges or to determine that the proposed use of the land was more necessary to the public than its use as a highway. In September, 1943, defendant wrote to the county stating that construction of a dam had been started and might result in a flooding of a portion of the third easement granted in December, 1941, for the new westerly approach to the Sacatara Bridge; that the grant provided for reversion to the grantor in the event of flooding; and that the company would "be glad to cooperate in any way that we may in the granting of a new easement, that will not be flooded by the construction of our dam." In October, 1943, a letter to the effect that the matter had been referred to the county counsel by the board of supervisors was sent to the district attorney with the notation: "cc California Water & Telephone Co.," indicating that a copy was sent to the company. There were no further communications until September, 1944, at which time the defendant had spent over $800,000 in the construction of the dam. The present action was filed about a month and a half later.

When the dam is finished and the reservoir full, the water will flood both bridges, a portion of the highway immediately west of the Sacatara Bridge, and all of the highway between that bridge and a point beyond the Peterson Bridge, but the record does not disclose whether the maximum elevation of the dam will require that the new road and bridge be constructed as high as the 1,400-foot level suggested by the company. The company is still willing to grant to the county, without charge, an easement for "the permanent road as surveyed by the plaintiff."

The trial court found that the company had "not been misled to its prejudice or injury by any act, conduct or declaration" of the county in connection with either of the temporary easements which the county accepted "or in any of the transactions of the parties relative to the construction and erection of said dam." It concluded that the acceptance by the county of the "forfeiture, reverter, and waiver of damages clauses" in the two easements was an ultra vires act; that the county had no power to abandon a county high-

way in such a manner or to "bind said Board by written contract to a particular line of official action toward a predetermined result," or to make a gift of county property; that the clauses were null and void; that the county was not estopped to deny the validity of the clauses or assert its rights in the highway and bridges; and that the flooding of the highway would constitute a taking and damaging of the county's property without compensation. Defendant was enjoined from flooding or interfering with the road and bridges "without first making just and adequate compensation to the plaintiff therefor."

It is clear that plaintiff has established a prima facie case for an injunction against the threatened destruction of its property by flooding. In view of the findings of the trial court, defendant, in order to prevail upon this appeal, must show that the stipulated facts compel the conclusion that the county either made a binding agreement to waive damages to its property or is estopped by its conduct to claim damages. All permissible inferences, of course, are to be drawn in favor of the county and in support of the judgment.

 Neither the acceptance of the easements containing provisions for waiver of damages nor any other conduct of the county created a *binding contractual obligation** to relocate the road or to abandon or waive damages to it, since any such agreement was unauthorized by law and void. The methods by which county boards of supervisors may abandon public highways are set forth in sections 954 to 960.4 of the Streets and Highways Code. Public hearings, after proper notification, are required in most situations. If a road has remained impassable for five years it may be abandoned simply upon the board's "own motion" (Sts. & Hy. Code, § 954), or, if it "has been superseded by relocation," the board may summarily vacate and abandon by resolution (Sts. & Hy. Code, §§ 960.1, 960.2). When the road has not actually

---

*It does not appear that the county made an express, or specific, agreement to relocate the highway, and the only claim is that the conduct of the county—in main, the acceptance of two easements purporting to waive damages by flooding to county property—amounted to an implied in fact agreement to abandon the existing road and to relocate the whole road at its own expense. Although there may be some doubt as to whether the waiver provisions covered all the road or only the two end portions embraced by the accepted easements, the county has not raised the issue and has conceded that if the "forfeiture, reverter and waiver of damage clauses are valid and binding on the County of San Diego then there is an end to the litigation."

been superseded or become impassable, the Streets and Highways Code authorizes only two methods by which a board of supervisors may abandon it, one by "resolution of intention," and the other, by petition of ten freeholders. Both of these methods require the fixing of a day for hearing, notice to all freeholders in the road district, publication of notice in a newspaper, hearing of evidence by any party interested, and a finding that the road, or portion thereof, "is unnecessary for present or prospective public use." (Sts. & Hy. Code, §§ 956.8-960.)

No statute authorizes the making of a contract to abandon a road and locate it elsewhere.

In the present case, no portion of the road had been rendered impassable for a period of five years at the time the asserted contract was made, and little, if any, of the road had actually been "superseded" by a new *permanent* road. Although the old road may have been straightened or temporarily moved, pursuant to the two accepted easements, the principal or central section that will be flooded has not been changed, even on a temporary basis. It is apparent, therefore, that the only authorized methods by which the board of supervisors could abandon the road required both notice and public hearing.

The cases are apparently uniform to the effect that, if the Legislature has provided a method by which a county or city may abandon or vacate roads, that method is exclusive. (See *People* v. *County of Marin*, 103 Cal. 223, 226 [37 P. 203]; *Hensley* v. *Lewis*, 278 Ky. 510 [128 S.W.2d 917, 920-1, 123 A.L.R. 537]; *McHenry* v. *Foutty*, —— Ind. —— [60 N.E.2d 781, 782]; *Hillsdale Co.* v. *Zorn*, 187 Okla. 38, [100 P.2d 436, 438].) An analogous line of decisions holds that a municipality must follow the statutory procedure prescribed for the sale of public property, and an attempt to dispose of the property by contract will not be enforced. (*Cimpher* v. *City of Oakland*, 162 Cal. 87 [121 P. 374]; *Hughes* v. *City of Torrance*, 77 Cal.App.2d 272, 277-279 [175 P.2d 290]; *City of Pasadena* v. *Estrin*, 212 Cal. 231, 235 [298 P. 14]; *San Francisco & O. R. R. Co.* v. *Oakland*, 43 Cal. 502; *Grogan* v. *San Francisco*, 18 Cal. 590, 608-612; see 3 McQuillin, Municipal Corporations [2d ed., 1943], §§ 1243, 1249.) As stated in the Hughes case, "the very fact that the Legislature provided a method whereby the city might dispose of its utilities is a positive inhibition against such alienation except by a

faithful compliance by the city with the statutory provision. . . .'' (77 Cal.App.2d at p. 278.) Specifically, it has been held that an agreement by local officials to abandon, vacate, or sell a road is void. (*State* v. *Castle*, 44 Wis. 670; *Provo City* v. *Denver & R. G. W. R. Co.* (C.C.A. 10th), 156 F.2d 710, cert. den. ―― U.S. ―― [67 S.Ct. 124, 91 L.Ed. ――] ; *Industrial Co.* v. *Tompkins* (Tex.Civ.App.), 27 S.W.2d 343; *Frank W. Coy Real Estate Co.* v. *Pendleton,* 45 R.I. 477 [123 A. 562, 565] ; 39 C.J.S. 1047-1048; cf., *American Medicinal Spirits Co.* v. *Mayor & City Council,* 165 Md., 128 [166 A. 407].) Such contracts have been disapproved not only because they are unauthorized by legislation and would permit evasion of the statutory mode of procedure and safeguards but also, it is said, because they constitute improper attempts by the local officials to bind themselves in advance as to the exercise of their judgment in the future and, further, because the receipt of the agreed consideration might influence their future decision, which is to be made primarily upon considerations of public necessity for highway purposes. (See *Breisch* v. *Locust Mt. Coal Co.,* 267 Pa. 546 [110 A. 242, 243, 9 A.L.R. 1330] ; *Frank W. Coy Real Estate Co.* v. *Pendleton,* 45 R.I. 477 [123 A. 562, 565] ; *State* v. *Castle,* 44 Wis. 670, 679; 25 Am.Jur. 415 et seq.; cf., *Wills* v. *City of Los Angeles,* 209 Cal. 448, 451-2 [287 P. 962, 69 A.L.R. 1044]; *Penley* v. *City of Auburn,* 85 Me. 278 [27 A. 158, 159, 21 L.R.A. 657].)

In the present case, since there has been no notice, hearing, finding as to public necessity, or resolution of abandonment, any agreement to relocate was unauthorized by law, and, under the authorities, was void.

A further reason for holding the agreement invalid may lie in the fact that, if enforced, it would to some extent result in a delegation of authority to the company to determine when, if at all, the abandonment and relocation should take place. At the time the agreement was made the company had not definitely decided when the dam was to be built, and the clauses of the easements, in effect, provided for reversion and waiver of damages only in the event that the company should decide to flood the road. No time limitation was placed upon the dam project, and no provision was made for any change in circumstances that might render a future relocation contrary to best public advantage and necessity. A contract to delegate public authority and discretion to private

individuals is, of course, improper. (See 3 McQuillin, Municipal Corporations [2d ed., 1943], § 1271.)

Finally, the company has apparently conceded that a county may not validly contract to waive damages for injury to an existing road.

The company contends, however, that since the county has a *general* power to abandon and relocate roads, it may be estopped by its promise to relocate even though it could not make a valid contract to do so and even though there was "irregularity" in the procedure by which the general power was exercised. In this connection it argues that the acceptance of the waiver clauses in the easements, although void as a contract, may nevertheless be considered as a part of the course of conduct by which it is claimed that the county led the company to believe that the road would be relocated. It should be noted, however, that the acceptance of these provisions is the only conduct of the county which might compel an inference that it agreed to bear the expenses of such a relocation. While the other acts of the county officials indicated that they were apparently in favor of having the dam constructed, this did not constitute a representation that the county would waive damages to its property nor compel a finding, contrary to that of the trial court, that the company was misled thereby.

It is true that in some "exceptional cases," or situations where "justice and right require it," a governmental body may be bound by estoppel. (*Farrell* v. *County of Placer*, 23 Cal.2d 624, 627-628 [145 P.2d 570, 153 A.L.R. 323]; *City of Los Angeles* v. *Cohn*, 101 Cal. 373, 376-378 [35 P. 1002]; *Times Mirror Co.* v. *Superior Court*, 3 Cal.2d 309 [44 P.2d 547]; *McGee* v. *City of Los Angeles*, 6 Cal.2d 390, 394 [57 P.2d 925]; *City of Los Angeles* v. *County of Los Angeles*, 9 Cal.2d 624 [72 P.2d 138, 113 A.L.R. 370].) However, as a corollary of the general rule that contracts wholly beyond the powers of a municipality are void, the California decisions have held that estoppel to deny their invalidity may not be invoked against a governmental body and, further, that estoppel may not be invoked where the procedure specified in a statute, such as the mode of contracting, is the measure of the power to act. (*Miller* v. *McKinnon*, 20 Cal.2d 83 [124 P.2d 34, 140 A.L.R. 570], and cases there cited; see *Farrell* v. *County of Placer*, 23 Cal.2d 624, 630-631 [145 P.2d 570, 153 A.L.R. 323].)

██ It is sometimes difficult to determine which of these rules is applicable in a particular case. It is clear, however, that neither the doctrine of estoppel nor any other equitable principle may be invoked against a governmental body where it would operate to defeat the effective operation of a policy adopted to protect the public. (See *Miller* v. *McKinnon,* 20 Cal.2d 83 [124 P.2d 34, 140 A.L.R. 570], and cases cited therein; *Pan Amer. Co.* v. *United States,* 273 U.S. 456, 505-506 [47 S.Ct. 416, 71 L.Ed. 734]; *American Surety Co. of N. Y.* v. *United States* (C.C.A. 10th), 112 F.2d 903, 906.) In the American Surety Company case the court stated that the government could not be estopped so as to "frustrate the purpose of its laws or thwart its public policy." (112 F.2d, at p. 906.) In 3 McQuillin, Municipal Corporations [2d ed., 1943], section 1266, it is said that various statutory procedures or steps exist to protect citizens and taxpayers from ill-considered contracts or those showing favoritism and that if recovery is allowed for property or services on the ground of estoppel or implied contract, "then it follows as the night the day that the statute or charter provision can always be evaded and set at naught." The author adds that the rule denying indirect enforcement of such void contracts harmonizes with our governmental system, appears to be supported by reason, and is not unjust, because the other party is charged with notice of the law. (See, also, *Miller* v. *McKinnon,* 20 Cal.2d 83, 88-89 [124 P.2d 34, 140 A.L.R. 570].)

There is nothing inconsistent with this view in *Farrell* v. *County of Placer,* 23 Cal.2d 624 [145 P.2d 570, 153 A.L.R. 323], and the cases there cited which hold that in some instances a governmental body may be estopped by the conduct of its officers. In those cases the facts clearly established that a grave injustice would be done if estoppel were not applied, and it did not appear that use of the doctrine would defeat any strong public policy or result in the indirect enforcement of an illegal contract.

██ Here, however, we are directly concerned with strong considerations of policy. The Legislature, for the protection of the public, has declared that a road may not be abandoned without notice, a hearing, and a finding that the road is unnecessary for present or prospective public use. Enforcement of a bare promise to abandon would not only mean a complete disregard of these salutary legislative requirements but would also be inconsistent with the additional policy against the making of contracts by a public body to exercise

its discretionary governmental powers in a particular manner. By indirect enforcement of such a "contract" the needs of persons using the highway might be ignored, and a method would be afforded by which officials and persons dealing with the agency could evade the law. (Cf., *Miller* v. *McKinnon,* 20 Cal.2d 83, 88-90 [124 P.2d 34, 140 A.L.R. 570].)

The argument that the company is not seeking to enforce the waiver provisions as a binding contractual obligation to abandon the road and locate it elsewhere is not helpful. The company's defense of estoppel, as it admits, is based solely upon the theory that the acts of the county constituted an implied in fact *promise* to relocate, or, in other words, an implied representation that it *would* do so, upon which the company relied to its detriment. Application of estoppel under these circumstances would obviously be tantamount to specific enforcement of the void promise to abandon, relocate, and waive damages, contrary to both the policy and letter of the law.

Upon similar reasoning, it has been squarely held in other jurisdictions that contracts between public officials and private persons for abandonment, vacation, or sale of streets are not enforceable by estoppel against the government where there has been insufficient compliance with the steps prescribed by law. (*State* v. *Castle,* 44 Wis. 670; *Provo City* v. *Denver & R. G. W. R. Co.* (C.C.A. 10th), 156 F.2d 710, cert. den., —— U.S. —— [67 S.Ct. 124, 91 L.Ed. ——]; *Industrial Co.* v. *Tompkins* (Tex.Civ.App.), 27 S.W.2d 343; *Beebe's Heirs* v. *City of Little Rock,* 68 Ark. 39 [56 S.W. 791, 798, 800, 801].) In the Provo City case the court relied in part upon decisions holding that the statutory requirement of vacation by ordinance was intended to give notice of the acts of the city's commission so that private property holders would have a chance to protect themselves. In addition the court pointed out that the contracting party, knowing that the law required passage of an ordinance, went ahead at its peril, and that it was in no position to urge "in a court of equity that the city be estopped and in that way completely wipe out the statute. . . ." (156 F.2d at p. 712.) Finally, the court stated that it was never contemplated that the city commission could thus "circumvent the statute and deprive the people of their right expressly granted by statute to approve or reject the proposed abandonment of a portion of the street which was in active use as a public thoroughfare." (156 F.2d at p. 712.)

In *State* v. *Castle, supra,* it was held that there could be no estoppel because "no law . . . authorizes the supervisors . . . to discontinue a highway by contract with the parties interested." (44 Wis., at p. 677.) The court suggested that the contract amounted to a surrender of legislative discretion, adding that it was at least questionable whether the making of the contract would not have rendered the closing of the road void even if the procedure had otherwise been regular, on the ground that the supervisors may have been influenced by the performance on defendants' part rather than by a consideration of the public good with respect to the road.

Courts have likewise refused to estop the government in many analogous situations where such questions of policy were present. (See, for example, *City of San Antonio* v. *Guadalupe-Blanco River Au.* (Tex.Civ.App.), 191 S.W.2d 118, 126 [contract to sell public utility] ; *Kansas City* v. *Rathford,* 353 Mo. 1130 [186 S.W.2d 570, 574-575] [oral agreement to perform services] ; *Hoboken Local No. 2, etc.* v. *City of Hoboken,* 133 N.J.L. 334 [44 A.2d 329, 333], affirmed 134 N.J.L. 616 [48A.2d 917] [unauthorized employment of regular policemen for extra day] ; *City of Amarillo* v. *Stapf,* 129 Tex. 81 [101 S.W.2d 229, 232] [unauthorized issuance of building permit].) No California decision squarely in point has been found, but the language in several opinions shows that matters involving public policy will be given particular attention where estoppel is asserted against an agency of the government. (See *City of Pasadena* v. *Estrin,* 212 Cal. 231, 235 [298 P. 14] [rejecting estoppel where charter provision "was enacted to protect the city and its taxpayers from unauthorized obligations"] ; *Fountain* v. *City of Sacramento,* 1 Cal.App. 461, 467 [82 P. 637] ; *County of Shasta* v. *Moody,* 90 Cal.App. 519, 523 [265 P. 1032] ; *Miller* v. *City of Martinez,* 28 Cal.App.2d 364, 370-372 [82 P.2d 519].)

Defendant contends that *Greene County* v. *Tennessee Eastern Elect. Co.* (C.C.A. 6th), 40 F.2d 184, supports its position that the county is estopped. There a county agreed by resolution to elevate a bridge which would be flooded when a utility company raised its dam. The county gave assurance that there would be no claim for damages, and it hired the utility company to do the work on the bridge, promising to pay warrants therefor at a later date. Subsequently, the county ordered the work stopped, claiming the resolution was ultra vires and unconstitutional. The court held that the county was estopped to claim damages for flooding or to deny

liability for the work done. On its facts this decision may be contrary to the cases cited hereinabove. The reasoning, however, is not necessarily inconsistent with the conclusion we have reached, because the court stated that the county did have power to waive its claim for damages to the bridge. Although the court said that the county had no authority to tax property unequally or to pledge credit to a power company, it did not otherwise discuss the question of whether or not the contract was illegal or void as being contrary to statutory requirement, nor did it mention the possibility that resort to estoppel might defeat public policy. Accordingly, the decision is not persuasive with respect to the problem presented here.

Other cases have held cities and counties estopped to deny abandonment of streets, but here, also, considerations of public policy were either not involved or not discussed. (See *Meyer v. Meldrum,* 237 Mich. 318 [211 N.W. 658]; *In re Melon St.,* 192 Pa. 331 [43 A. 1013, 1015]; *Borough of Milford* v. *Burnett,* 288 Pa. 434 [136 A. 669]; *O'Leary* v. *Metropolitan St. Ry. Co.,* 87 Kan. 22 [123 P. 746, 749-750]; *City of Rochester* v. *North Side Corp.,* 211 Minn. 276 [1 N.W.2d 361, 138 A.L.R. 1375]; *Dabney* v. *City of Portland,* 124 Or. 54 [263 P. 386]; 31 C.J.S. 430.) Moreover, most of these cases involved *direct* encroachment upon the street, erected at a considerable expense and acquiesced in by the governmental body for a long period of time, whereas in the present case the county's property itself has not as yet been seized or injured, and the county is not in the position of having acquiesced to a direct encroachment. This court has held that a city was estopped to complain that a building encroached on a street where private persons had possession of the land for over 40 years. (*City of Los Angeles* v. *Cohn,* 101 Cal. 373 [35 P. 1002].) In that case, however, after the foundations of the building had been laid, the city attorney investigated the title to the property and reported to the city council that the city had no interest, and the encroachment was allowed to remain for 20 years before the city asserted any rights. The court also stated that the conduct of the city was equivalent to an agreement to locate the true boundary line of the street, and a city may properly make such an agreement where the boundary is uncertain. (*Muchenberger* v. *City of Santa Monica,* 206 Cal. 635 [275 P. 803].) The other California cases cited by the company are also distinguishable upon the ground that they either did not involve or did not discuss the danger that a strong rule of policy, adopted for the benefit of the

public, would be nullified by resort to the doctrine of estoppel. (*Pedro* v. *County of Humboldt*, 217 Cal. 493 [19 P.2d 776]; *Times Mirror Co.* v. *Superior Court*, 3 Cal.2d 309 [44 P.2d 547]; *McGee* v. *City of Los Angeles*, 6 Cal.2d 390 [57 P.2d 925]; *City of Los Angeles* v. *County of Los Angeles*, 9 Cal.2d 624 [72 P.2d 138, 113 A.L.R. 370].)

The company urges as a separate ground for estoppel the fact that the county has retained the benefits of the asserted agreement. All of the California cases hold, however, that receipt of benefits by the governmental body is insufficient to raise an estoppel where, as here, the transaction is unauthorized by law and contrary to public policy. (*Miller* v. *McKinnon*, 20 Cal.2d 83 [124 P.2d 34, 140 A.L.R. 570], and cases there cited; *Mullan* v. *State*, 114 Cal. 578; *Miller* v. *City of Martinez*, 28 Cal.App.2d 364 [82 P.2d 519]; *County of Shasta* v. *Moody*, 90 Cal.App. 519 [265 P. 1032]. For cases in other jurisdictions, see *State* v. *Castle*, 44 Wis. 670; *Provo City* v. *Denver & R. G. W. R. Co.* (C.C.A. 10th), 156 F.2d 710, cert. denied —— U.S. —— [67 S.Ct. 124, 91 L.Ed. ——]; cf. *Kansas City* v. *Rathford*, 353 Mo. 1130 [186 S.W. 2d 570, 574].

It should be noted, in connection with this contention, that the agreement was one-sided, with the greater part of the benefit running to the company. The county has maintained its road over the company's property for many years, and the two accepted easements, designed to reduce curvature, were to a considerable extent superimposed upon the old right of way. Further, the easements accepted by the county were temporary only, to cease as soon as the flooding occurred, and covered merely part of the road, not the whole of it. In exchange for this temporary right, the county, according to defendant's version of the effect of the agreement, would be required to abandon its entire road in the locality to be flooded, together with the two bridges and any other county property injured or destroyed. It does not appear from the record that the building of the dam would constitute an adequate consideration for the abandonment of the road. The agreement did not include any proposal to devote water or electric power to the benefit of the county or of its residents, and there is no assurance or guaranty that any water or power would be so used, or that the dam would be operated for the benefit of the public, or that it would continue in operation for a reasonable period after the destruction of the highway by flooding. The mere fact that the county would be able to tax the project would not be an adequate consideration.

 Entirely independent of the question of estoppel it is asserted that the county may not come into a court of equity and obtain injunctive relief without first offering to return the consideration it received for the void agreement, that is, without surrendering the benefits it enjoys under the temporary easements. Here, however, the consideration was transferred as a result of the invalid agreement, and clearly the county is not barred by failure to restore anything which it is no longer able to return. (Cf. *Miller* v. *McKinnon*, 20 Cal. 2d 83 [124 P.2d 34, 140 A.L.R. 570].) We need not determine how much, if any, of the balance of the property the county must eventually restore, since, under the circumstances of this case, an offer to restore cannot be held a condition precedent to the maintenance of the action. Obviously, it would be harmful to the county to require any restoration in advance of settlement of the entire controversy, and the circumstances are such that a final decree may fully adjust the equities between the parties. The present case is analogous to rescission, and, while restoration is ordinarily required, "an offer to restore before action is not essential where the rights of the other party can be fully protected by the decree, and such restoration cannot be made without injuriously affecting the rights of the party seeking rescission. . . ." (*California etc. Co.* v. *Schiappa-Pietra*, 151 Cal. 732, 740 [91 P. 593].)

 The company contends, finally, that the decree was too indefinite and uncertain to be valid or enforceable. It argues that it was enjoined from flooding the road or bridges "without first making just and adequate compensation to the plaintiff therefor," but that the court failed to declare what would be just compensation, what factors should be considered in fixing compensation, or when the compensation should be paid. These matters were expressly left open, and it was contemplated by the decree that the compensation should be ascertained in subsequent proceedings if the parties were not able to agree upon a satisfactory settlement. The real issue presented by the county is whether compensation shall be paid for loss of the road, and no question is raised as to the right of the company upon payment to complete the dam and flood the road.

The judgment is affirmed.

Shenk, J., Edmonds, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.